# NO. 25-4200

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## JERMAINE DERRICK CARSON, JR.,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT ASHEVILLE**

_____

## BRIEF OF APPELLANT

_____

**John G. Baker**
FEDERAL PUBLIC DEFENDER FOR THE
  WESTERN DISTRICT OF NORTH CAROLINA

**Melissa S. Baldwin**
ASSISTANT FEDERAL PUBLIC DEFENDER
**One Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992**

*Counsel for Appellant*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .........................................................................................iv

Introduction ........................................................................................................1

Jurisdictional Statement .....................................................................................3

Statement of the Issues........................................................................................3

Statement of the Case..........................................................................................4

A.     A tipster's claim that Carson is involved in criminal activity at a public housing complex is discredited by the ensuing investigation ..............................................................................4

B.     Agent Corthell stops an SUV, in which Carson is a passenger, for a driver with a suspended license .....................................5

C.     Corthell failed to take the usual steps prior to stopping a vehicle and runs database searches unrelated to the suspended license violation.................................................................7

D.     Corthell pauses the citation process to deliberate on getting a narcotics-detection dog ........................................................9

E.     After Corthell's canine officer deliberation, Officer Hayes announces he smells marijuana.........................................10

F.     The driver is reassured that the officers are "not the weed police"..................................................................................13

G.     Officer Escobedo frisked Carson ........................................13

H.     Carson is charged with possessing a firearm as a convicted felon and moves to suppress evidence obtained in violation of the Fourth Amendment................................................15

I.     During the hearing, the stopping officer admits to writing a false report on the stop and the officer who detected a marijuana odor claims he can identify, seven months later, the precise millisecond of detection.........................................15

J.     The court denies Carson's suppression motion..................20

i

K.      The district court denied Carson's suppression motion and Carson enters into a conditional plea agreement and is sentenced ..................................................................24

Summary of Argument.................................................................26

Standard of Review ....................................................................28

Argument....................................................................................29

I.      The traffic stop violated Carson's Fourth Amendment rights......................29

A.      An officer conducting a pretextual stop may not lengthen the seizure by conducting an unrelated investigation absent independent reasonable suspicion ......................................................29

B.      Corthell added time to the seizure by investigating matters unrelated to the suspended license violation absent reasonable suspicion ...................................................................32

1.      During the stop, Corthell researched the criminal history of the vehicle and non-operating owner and attempted to obtain a narcotics-detection dog .........................32

2.      Corthell's actions added time to the stop, because he paused the citation-issuing process to investigate the unrelated matters ..................................................36

3.      When Corthell began his unrelated investigations he had neither consent, nor reasonable suspicion of other criminal activity ..................................................38

C.      Analyzing whether Corthell had reasonable suspicion cannot, under controlling precedent, consider Hayes' uncommunicated observations .........................................39

II.      The frisk violated Carson's right against unreasonable searches..................41

A.      Carson's presence in a vehicle with a marijuana odor and his decade old convictions did not present a reasonable suspicion that he was armed and dangerous, under the circumstances of this stop..................................................................42

     B.     The Court should reconsider Sakyi's presumption that reasonable suspicion of drugs supplies reasonable suspicion an individual is armed and dangerous, when the only suspected drug is marijuana ...............................................47

Conclusion ................................................................................................52

Request for Oral Argument.......................................................................53

Certificate of Compliance .........................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arizona v. Johnson,*
555 U.S. 323 (2009)..................................................................41

*Brendlin v. California,*
551 U.S. 249 (2007)..................................................................29

*Doornbos v. City of Chicago,*
868 F.3d 572 (7th Cir. 2017).....................................................42

*Feinberg v. Comm'r of Internal Revenue,*
916 F.3d 1330 (10th Cir. 2019).................................................50

*Florida v. Jimeno,*
500 U.S. 248 (1991)..................................................................48

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.,*
542 U.S. 177 (2004)..................................................................29

*Jiminez v. Mary Washington College,*
57 F.3d 369 (4th Cir. 1995).......................................................37

*Lange v. California,*
594 U.S. 295 (2021)..............................................................48, 49

*McMellon v. United States,*
387 F.3d 329 (4th Cir. 2004)......................................................49

*Minnesota v. Dickerson,*
508 U.S. 366 (1993)..................................................................41

*Ohio v. Robinette,*
519 U.S. 33 (1996)....................................................................48

*Rodriguez v. United States,*
575 U.S. 348 (2015)............................................................*passim*

*Terry v. Ohio,*
392 U.S. 1 (1968)..............................................................2, 27, 38, 41

*U.S. Dep't of Health Human Servs. v. Fed. Labor Relations Auth.,*
983 F.2d 578 (4th Cir. 1992)......................................................50

*United States v. Anguiano,*
791 F.App'x 841 (11th Cir. 2019)........................................................................36

*United States v. Baker,*
108 F.4th 1241 (10th Cir. 2024)..........................................................................31

*United States v. Betts,*
88 F.4th 769 (8th Cir. 2023)................................................................................31

*United States v. Bowman,*
884 F.3d 200 (4th Cir. 2018)..........................................................................41, 43

*United States v. Campbell,*
26 F.4th 860 (11th Cir. 2022)..............................................................................37

*United States v. Cox,*
992 F.3d 706 (8th Cir. 2021)................................................................................34

*United States v. Darrell Harris,*
Case No. 24-4509 ................................................................................................46

*United States v. Drakeford,*
992 F.3d 255 (4th Cir. 2021)..........................................................................44, 46

*United States v. Frazier,*
30 F.4th 1165 (10th Cir. 2022).................................................................35, 36, 39

*United States v. Foster,*
634 F.3d 243 (4th Cir. 2011)................................................................................46

*United States v. George,*
732 F.3d 296 (4th Cir. 2013)................................................................................41

*United States v. Green,*
897 F.3d 173 (3d Cir. 2018).............................................................................31, 39

*United States v. Hill,*
852 F.3d 377 (4th Cir. 2017).........................................................................*passim*

*United States v. Hunter,*
88 F.4th 221 (3d Cir. 2023)..............................................................................1, 34

*United States v. Hurtt,*
31 F.4th 152 (3d Cir. 2022)..................................................................................36

*United States v. Jones,*
565 U.S. 400 (2012).............................................................................................42

*United States v. Landeros*,
913 F.3d 862 (9th Cir. 2019)................................................................34, 35

*United States v. Leon*,
80 F.4th 1160 (10th Cir. 2023)................................................................33

*United States v. Massenburg*,
654 F.3d 480 (4th Cir. 2011)................................................................2, 27, 40

*United States v. Medley*,
34 F.4th 326 (4th Cir. 2022)................................................................28

*United States v. Miller*,
54 F.4th 219 (4th Cir. 2022)................................................................*passim*

*United States v. Montoya de Hernandez*,
473 U.S. 531 (1985)................................................................31

*United States v. Palmer*,
820 F.3d 640 (4th Cir. 2016)................................................................25

*United States v. Perrin*,
45 F.3d 869 (4th Cir. 1995)................................................................49, 50

*United States v. Podbielski*,
No. 22-4084, 2023 WL 4888866 (4th Cir. Aug. 1, 2023)................................................................30

*United States v. Powell*,
666 F.3d 180 (4th Cir. 2011)................................................................45

*United States v. Sakyi*,
160 F.3d 164 (4th Cir. 1998)................................................................*passim*

*United States v. Stanfield*,
109 F.3d 976 (4th Cir. 1997)................................................................49, 50

*United States v. Weaver*,
9 F.4th 129 (2d Cir. 2021)................................................................42, 44

*United States v. Whitley*,
34 F.4th 522 (6th Cir. 2022)................................................................31

*United States v. Williams*,
808 F.3d 238 (4th Cir. 2015)................................................................28

*United States v. Williams*,
808 F.3d 253 (4th Cir. 2015)................................................................49, 50

*United States v. Williams*,
    No. 22-10052, 2023 WL 5925893 (9th Cir. Sept. 12, 2023) .............................36

*United States v. Wilson*,
    506 F.3d 488 (6th Cir. 2007) ...............................................................47

*Whren v. United States*,
    517 U.S. 806 (1996) ......................................................................1, 29

**Statutes & Other Authorities:**

U.S. Const. amend. IV ........................................................................*passim*

18 U.S.C. § 922(g) ...................................................................................15

18 U.S.C. § 3231 .......................................................................................3

18 U.S.C. § 3742 .......................................................................................3

28 U.S.C. § 1291 .......................................................................................3

Anna Jackson & Katherine Schaeffer, *9 facts about Americans and
    marijuana*, Pew Research Center (July 8, 2025) ....................................51

Associated Press, *By the numbers: There are now more daily marijuana
    users in the US than daily alcohol users* (May 22, 2024) ........................51

Associated Press, *Sale and use of marijuana permitted under ordinance
    Cherokees in North Carolina approved* (June 7, 2024)............................51

Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime
    Areas*, 107 Cal. L. Rev. 345 (2019) .....................................................44

CDC, *State Medical Cannabis Laws* ..........................................................50

Congressional Research Service, *State Marijuana 'Legalization' and
    Federal Drug Law: A Brief Overview for Congress*, (updated May 14,
    2024) ............................................................................................50

Elliott Davis Jr. & Marissa Yelenik, *Where is Weed Legal? A Guide to
    Marijuana Legalization* U.S. News (June 30, 2025)..............................51

N.C. Gen. Stat. § 14-72.3 .........................................................................46

N.C. Gen. Stat. Ann. § 15A-1340.23 ............................................................6

N.C. Gen. Stat. Ann. § 20-28 ......................................................................6

N.C. Gen. Stat. § 20-63(e) ........................................................................47

N.C. Gen. Stat. § 20-127(d) ......................................................................47

N.C. Gen. Stat. § 20-141(j1) .....................................................................47

N.C. Gen. Stat. Ann. § 90-95(d)(4).............................................................47

NC State Bureau of Investigations, NC Traffic Stop Statistics: Initial
    Purpose of Traffic Stop by Enforcement Action Taken (2024) ...........................1

Ryan S. King and Marc Mauer, *The war on marijuana: the transformation
    of the war on drugs in the 1990s*, 3 Harm Reduct J. (2006)...............................49

**Introduction**

"Traffic stops are the most common form of involuntary contact civilians have with police." *United States v. Hunter*, 88 F.4th 221, 227 (McKee, J., concurring) (3d Cir. 2023). Last year, in North Carolina, law enforcement conducted over 1.27 million traffic stops.[1] Because the Constitution permits pretextual stops, *Whren v. United States*, 517 U.S. 806, 815 (1996), the primary protection against abusive traffic stops is that their duration and scope is strictly cabined to investigating the violation that justified the stop. *See Rodriguez v. United States*, 575 U.S. 348, 350-58 (2015). Any unrelated investigation that adds time to the stop must be supported by "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 354-57.

Jermaine Carson was a passenger in a vehicle stopped for a driver suspected of having a suspended license. Rather than diligently address the suspended license violation, the stopping officer instead spent time researching if the vehicle was previously involved in crimes and the registered owner's criminal history without knowing if the owner was present, as well as discussing obtaining a narcotics-detection dog. Because the officer did not have reasonable suspicion for any other criminal activity, this detour into investigating general unrelated wrongdoing

---

[1] NC State Bureau of Investigations, NC Traffic Stop Statistics: Initial Purpose of Traffic Stop by Enforcement Action Taken (2024), available at <https://trafficstops.ncsbi.gov/Default.aspx?pageid=2>.

violated the Fourth Amendment. Contrary to the district court's ruling, the stopping officer's unrelated investigation could not be justified based on an observation by another officer that was not communicated to him. *United States v. Massenburg*, 654 F.3d 480, 491-95 (4th Cir. 2011).

This pretextual traffic stop, like so many others, escalated to frisking Carson. To frisk, the officer needed a reasonable belief that Carson was armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The district court here found such a belief based solely on a marijuana odor under *United States v. Sakyi*, 160 F.3d 164 (4th Cir. 1998). *Sakyi* established a rebuttable presumption that reasonable suspicion drugs are present in a stopped vehicle provides reasonable suspicion any occupant is armed and dangerous. *Id.* at 169. But a reasonably prudent officer would not believe that Carson was armed and dangerous based on the circumstances here. First, simple marijuana possession is a low-level misdemeanor and its use is now widely tolerated across the country. The detective at the stop admitted to a practice of confiscate-without-charges for marijuana possession. Second, police outnumbered the occupants during the stop for a minor traffic violation, where the occupants were cooperative. And third, Carson's old criminal history does not support present safety concerns. To the extent this Court's *Sakyi* presumption dictates holding Carson's frisk was reasonable, it should be reconsidered as it applies to reasonable suspicion of mere marijuana possession.

## Jurisdictional Statement

The United States District Court for the Western District of North Carolina had jurisdiction over this criminal case under 18 U.S.C. § 3231. The district court entered a final judgment on April 8, 2025, JA560, which Carson timely appealed the following day, JA567. This Court thus has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## Statement of the Issues

1. Under the Fourth Amendment, an officer cannot add time to a traffic stop to investigate an unrelated matter absent reasonable suspicion. During a traffic stop for a suspended license, did the officer's investigation into the vehicle's criminal past, the registered owner's criminal history absent knowledge the owner was present, and attempt to obtain a narcotics-detection dog violate the Fourth Amendment?

2. This Court follows a rebuttable presumption that, during a traffic stop, an officer may reasonably believe any occupant is armed and dangerous if there is reasonable suspicion that drugs are present. *Sakyi*, 160 F.3d at 169. Was the presumption rebutted here? If not, should the Court revisit the presumption's application to suspicion of marijuana possession?

**Statement of the Case**

**A.     A tipster's claim that Carson is involved in criminal activity at a public housing complex is discredited by the ensuing investigation.**

In late April, early May, Asheville police investigated individuals, including Carson, hanging out in a parking lot of the Aston Garden public housing complex. JA299-302. The property manager told police that residents were complaining about younger males selling drugs and openly carrying firearms in the parking lot, which was shared with another public housing complex, Aston Park Towers. JA156-158, JA299-300. The complaint did not specify if the males were residents or non-residents. JA300. But it did prompt officers to review the complex's surveillance footage. JA300-301. Police saw a "group" or "crowd" hanging out in the parking lot, which included Carson. JA300-302. How many people made up this "group" or "crowd" is unknown, as is how often the "group" hung out in the parking lot, and whether the group's members resided in the complexes to which the parking lot attached.

Two of the officers who reviewed surveillance footage during the investigation were Officer Escobedo and Detective Beddow. JA157, JA303.

While investigating the complaint, Escobedo ran Carson's name through a local database. JA305. The search results listed arrest warrants for armed robbery,

burglary, kidnapping, and assault from over a decade ago. JA305-308, JA352-353.

It also included the following "alert":

```
[ALERTS]
01/30/2012 DNA
Alert Expires: No Expiration Date Set
03/22/2012 VIOLENT OFFENDER
Alert Expires: No Expiration Date Set
Notes: Robbery / Kidnapping / Burglary conviction [03/22/2012 20:20, TOMASETL, 4132, APD]
```

JA353.

In reviewing the complex's surveillance footage, Escobedo suspected drug dealing was occurring because he saw people approach "the group," get directed to certain apartments, and then those people would enter the apartment, exit, and leave. JA303. But Escobedo never saw Carson engage in what he believed to be a hand-to-hand transaction, nor did he see Carson otherwise engage in any suspicious behavior. JA328-329.

Detective Beddow also reviewed surveillance footage, which at some point showed Calvin Washington driving a Toyota Highlander SUV. JA157. This led him to run Washington through a database that indicated Washington had a suspended license. JA158-160.

**B.**     **Agent Corthell stops an SUV, in which Carson is a passenger, for a driver with a suspended license.**

About a month after police received the Aston Garden complaint, on May 20, 2023, members of the Asheville Police Department and the North Carolina

Alcohol Law Enforcement Agency ("ALE")[2] embarked on their first joint investigation together. JA182, JA433. The operation was to address increased violent crime near the city's bars and nightclubs, with ALE providing jurisdiction and Asheville police providing manpower. *Id.* There was a pre-operation briefing around 9 or 10 PM that provided background information and assigned surveillance areas. JA183.

Rather than proceed to his assigned bar area, Beddow stopped at a gas station a couple miles from the Aston Garden apartments because sometimes bar patrons stopped at that station as they were coming to or from a bar. JA152-154. Beddow saw Washington drive the Highlander into the gas station around 11:15 PM. JA155. Beddow also saw a female passenger, but the tinted windows prevented him from seeing whether there were any other passengers. JA155-156.

When the Highlander departed, Beddow followed and communicated over the radio that he was following a Highlander for a suspected suspended license. JA162, JA164-165. Driving with a suspended license is a Class 3 misdemeanor, N.C. Gen. Stat. Ann. §§ 20-28, punishable by a fine-only or up to 30 days' imprisonment, depending on the driver's criminal record, N.C. Gen. Stat. Ann. § 15A-1340.23.

---

[2] ALE is a state regulatory agency that enforces the alcohol, gambling, and drug laws in and around establishments licensed to sell alcohol. JA179-180.

Beddow's communication was overheard by ALE Agent Corthell, who was nearby. JA188. Corthell soon spotted the Highlander and, around 11:25 PM, pulled it over. JA188-192.

The stop occurred on a two-lane road before the intersection of South French Broad Avenue and Phifer Street. JA192. Although vehicles can turn right or left, less than half a mile in either direction was the Aston Garden complex or another public housing complex. JA267-268. Beddow had radioed to stop the Highlander before it arrived at the Aston Garden complex, because he preferred to conduct traffic stops in less populated areas. JA166. According to Beddow, bystanders could distract stopping officers or help motorists and there was more foot traffic at public housing complexes. JA166-167. Corthell likewise had concerns with bystanders during traffic stops in areas near public housing complexes as he had experienced bystanders yell at him and even throw bottles at him. JA193. Corthell addresses his safety concern by "expedit[ing] vehicle stops" in such areas. JA193.

### C. Corthell failed to take the usual steps prior to stopping a vehicle and runs database searches unrelated to the suspended license violation.

Corthell proceeded to the driver's side of the Highlander, where he asked for Washington's license. JA196-198. Rather than a license, Washington provided an identification card. JA198. There was also a female in the front seat and Carson was sitting in the backseat behind her. JA110-111. Corthell returned to his vehicle,

without asking the other occupants for any information. JA199. Corthell generally does not require non-driver occupants to provide their information in a stop. JA206.

Although Corthell knew that his participation in the joint operation could include a traffic stop and that he should have planned for such an action, he did not. JA224-225. When he stopped the Highlander, he did not know his citation book's location and had not started the computer program, which checks vehicles' registration. JA197, JA225. So "[n]ormally," the vehicle's registration is checked before stopping the vehicle, but Corthell did not do so here. JA197. Instead, he had to boot up his vehicle's computer program to check the registration, which is "a process" and requires a two-factor authentication to log in. JA197-200. Once running, Corthell checked Washington's license status, if he had any active North Carolina warrants, his criminal history, and the Highlander's registration. JA203-204.

After checking Washington's information, Corthell did not begin preparing a citation but instead made additional inquiries into the registered owner and Highlander's criminal history. Specifically, he examined whether the Highlander was ever flagged for being involved in violent crime and checked the registered owner's driving status, presence of active warrants, and criminal history, even though he did not know if that owner was present. JA201, JA204-205, JA209,

8

JA211. He also admitted to possibly researching the state's general statutes database to find the correct section to charge, JA207, JA249, even though no subsection was cited in the ultimately issued citation, JA355.

Detective DeStefano arrived and approached the Highlander's passenger side while Corthell obtained Washington's identification. JA110-111, JA198. Carson and the other passenger provided DeStefano with their names as requested. *See* JA Vol. IV at Gov't Exh. 1, Ofc. DeStefano BWC Footage (hereinafter "Ofc. DeStefano") at 23:25:25:13-23:25:45. DeStefano subsequently returned to his vehicle to run a warrant check on Carson. JA113-115. By then, there were at least five uniformed law enforcement officers at the stop. Ofc. DeStefano at 23:25:13-23:26:32.

### D. Corthell pauses the citation process to deliberate on getting a narcotics-detection dog.

Corthell was in his patrol vehicle for about two minutes. *See* Ofc. DeStefano at 23:25:22 (Corthell turning away from the driver), 23:27:33 (Corthell approaching DeStefano's vehicle). Then, rather than looking for his lost citation book, Corthell went to have a discussion with DeStefano. JA134, JA210. Corthell began by asking if DeStefano was "hot[,]" i.e., recording JA134. DeStefano advised that he was recording. *Id.* Corthell then stated: "Do we wanna bring a dog up here, while I'm writing the citation?" Ofc. DeStefano at 23:27:40; JA236. At this point, neither Corthell, nor DeStefano had any evidence of drug activity.

JA236. Corthell had merely seen "alerts for felony drugs, approach with caution" in the database used to check Washington's records. JA237.[3] Nevertheless, Corthell admitted that if a record check indicated an occupant of the stopped vehicle has a drug-involved criminal history, it is "normal…to propose calling in drug canines for vehicle stops where [he] ha[s] no suspicion of drug activity[.]" JA236.

DeStefano responded to the narcotics-dog query by asking if Corthell "got anything in the car[,]" which Corthell answered in the negative, and DeStefano too admitted he had nothing to hold the occupants. Ofc. DeStefano at 23:27:40-23:27:59. Corthell then proceeded back to his vehicle to begin "the process of looking for…a ticket book." JA240-242.

### E. After Corthell's canine officer deliberation, Officer Hayes announces he smells marijuana.

As Corthell was returning to his vehicle, Officer Hayes approached and Corthell asked if he "got anything?" JA Vol. IV, Gov't Exh. 2, Ofc. Hayes BWC Footage (hereinafter "Ofc. Hayes") at 23:28:07, JA240. Hayes replied that "we can search it. I got a digital scale right between the seats" but wanted to confirm if DeStefano also observed the scale. Ofc. Hayes at 23:28:07-23:28:15. Corthell exclaimed, "Awesome." *Id.*

---

[3] The record does not reveal what an "alert[ ]" in the database signifies.

Shortly after Corthell had stepped away to check Washington's status, Hayes arrived at the traffic stop. *Id.* at 23:25:28. Hayes came to assist after hearing radio communications that officers were pursuing a vehicle heading in a direction towards a public housing complex, which he believed to be a high-crime area. JA252-254. He was not part of the operation with ALE and did not attend the pre-operation briefing. JA143.

Upon arrival, Hayes headed towards the driver from the Highlander's rear. Ofc. Hayes at 23:25:28-23:26:00. Along the way, he peered into the back seat to look for any passengers or weapons. *Id.*, JA257-258. The back window, behind the driver, was cracked 2-3 inches. JA257-258. Hayes stood outside the closed driver's door, making small talk with Washington, such as asking about the candy he was eating. JA259; Ofc. Hayes at 23:26:00-23:28:02. Washington was "extremely cordial and polite" with Hayes. JA282. After about two minutes with Washington, Hayes told him to sit tight as he went to speak with DeStefano. Ofc. Hayes at 23:26:00-23:28:07.

After telling Corthell they could search the car, Hayes proceeded to tell DeStefano, "I got PC to search if you want it. Got a digital scale between the seats and smell of marijuana." Ofc Hayes at 23:28:15-23:28:21. After DeStefano pressed Hayes, Hayes admitted to merely "think[ing] it's a scale." Ofc. Hayes at 23:28:28.

11

Hayes' bodyworn camera showed a small blue rectangular object between Washington's leg and the center console, shown below:



Ofc. Hayes at 23:28:32 (red circle added).

DeStefano instructed Hayes to further investigate the supposed scale, JA269, so Hayes returned to the Highlander and asked Washington to hand him the scale. Ofc. Hayes at 23:28:31-36. Washington complied, handing Hayes the object, which was a digital scale. Ofc. Hayes at 23:28:31-23:28:40.

As to the marijuana odor, Hayes was the first officer to detect any odor. DeStefano did not smell anything while he stood outside the backseat of the passenger side for over a minute with the front window completely open and the back window half open. JA135; Ofc. DeStefano at 23:25:13-23:26:32. Corthell too did not smell anything, but he lost some sense of smell from a recent COVID-19 infection. JA198.

**F. The driver is reassured that the officers are "not the weed police."**

After Hayes' revelation, DeStefano ordered Washington out of the car to apprise him of the situation. Ofc. DeStefano at 23:28:39-29:32. In doing so, DeStefano advised that: "We're not the weed police" but "we're gonna search the car, just based on PC." *Id.* This meant they would seize marijuana for proper disposal, but would not prosecute user amounts. JA136-137. DeStefano later explained that declining marijuana prosecutions was a means of improving relations between the community and police. JA136.

**G. Officer Escobedo frisked Carson.**

Officer Escobedo was one of the last officers to arrive at the stop. *See* JA Vol. IV, Gov't Exh. 3, Det. Escobedo BWC Footage (hereinafter "Det. Escobedo") at 23:27:50-23:28:26 (arriving in the fifth patrol vehicle at the scene). Upon arrival, he only knew that Washington was driving on a suspended license. JA296. Escobedo walked directly to the Highlander without interacting with the other officers, but overheard Hayes telling DeStefano that there was probable cause to search the Highlander because a scale and marijuana odor were present. JA296-298. Because Escobedo previously looked into Carson when investigating the Aston Garden complaint, he immediately recognized the backseat passenger as Carson. JA297-301.

Escobedo ordered Carson out of the vehicle. JA310-311, Det. Escobedo at 23:29:00-29:03. Carson complied. *Id.* Escobedo asked if Carson had any weapons on him, touched his back, and pulled up Carson's pants, which were sagging low, close to his knees. JA313, Det. Escobedo at 23:29:03-29:11. Escobedo did not hear an answer as Carson whispered in response to questioning. JA312-313. He heard Carson say something indiscernible about his pants, so he replied that he'd pull them up as he pulled Carson's pants up a second time. JA313, Det. Escobedo at 23:29:11-29:18. When Escobedo pulled the pants up, he felt something weighing the pants down. JA313. Escobedo then continued the frisk by reaching around Carson's front waist and patting Carson's inner left thigh. Det. Escobedo at 23:29:18-29:22. Escobedo ordered Carson to spread his feet wider, for a "more thorough" frisk. JA313, Det. Escobedo at 23:29:22-29:29. Carson then revealed he had a firearm, which prompted Escobedo to cuff Carson and retrieve a firearm from his pants leg. JA314. Carson was arrested and transported to jail. JA43.

Following Carson's arrest and the automobile search, Washington and the female passenger were free to leave with the police's gratitude for their cooperation. Ofc. DeStefano at 23:44:17-23:45:50. Before Washington left, Corthell wrote and issued the suspended license citation, which took thirty-five seconds. Ofc. DeStefano at 23:44:52-23:45:27. Corthell also assured Washington that he didn't care if the violation gets dismissed. *Id.* at 23:45:28-45:32.

**H. Carson is charged with possessing a firearm as a convicted felon and moves to suppress evidence obtained in violation of the Fourth Amendment.**

Following the traffic stop, Carson was charged with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). JA12.

Carson filed a motion arguing that Corthell's stop and Escobedo's frisk violated his Fourth Amendment rights and any evidence obtained as a result of these violations should be suppressed. JA15-32. The government opposed, arguing the stop and frisk were constitutional. JA59. It did not raise any exception to the exclusionary rule. JA44-59. Following the parties' dueling narratives, the magistrate judge scheduled an evidentiary hearing on the motion. *See* JA74-337.

**I. During the hearing, the stopping officer admits to writing a false report on the stop and the officer who detected a marijuana odor claims he can identify, seven months later, the precise millisecond of detection.**

The government called DeStefano, Beddow, Corthell, Hayes, and Escobedo to testify. JA92-330. It also introduced the bodyworn camera footage taken by DeStefano, Beddow, and Hayes during the stop. *See* JA Vol. IV.

At the hearing, Corthell admitted writing a false narrative on the stop in his report. *See* JA228. For example, Corthell's report asserted that, prior to stopping the Highlander, police radio broadcasts reported Carson was also traveling in the car with Washington and he was a convicted felon known for carrying a firearm. JA40. But Corthell, after reviewing the investigation's case materials, could not

identify any source for his belief. JA195. And the only broadcasted information introduced at the hearing affirmatively showed no such information was broadcast. JA37-38, JA232.

Corthell's report also claimed that "while" "preparing a written citation for Washington," he overheard that officers observed drug paraphernalia in the Highlander. JA40. Corthell admitted that he was directly told about drug paraphernalia and that he was not preparing a citation when this occurred. JA241-242. Corthell's report also claimed that he re-located the Highlander to the parking lot, when he did not; Washington did. *Compare* JA40-41 *with* JA246.

Corthell complained that he was told the report was needed for discovery and felt pressured to write it quickly. JA244.

When Hayes testified, he identified 11:25:52 PM as the moment he first smelled marijuana emanating from the Highlander. JA273-275. He admitted to first identifying the precise moment he smelled marijuana a couple days before the hearing. JA280. The hearing took place just shy of eight months after the traffic stop. JA279. During this nearly 8-month period, Hayes participated in 500 other traffic stops. JA280.

Hayes testified that he "believe[d]" 11:25:52 PM was the moment he smelled marijuana, not from memory, but because that was when he believed his bodyworn camera footage showed his nose being equal to the back window's

opening. JA274, JA278. But the footage at this moment, based on his flashlight's reflection on the Highlander, showed he was still some distance from the back window's opening at 11:25:52 PM:

[space intentionally left blank]



11:25:49 PM  11:25:50 PM
11:25:51 PM  11:25:52 PM
11:25:53 PM  11:25:54 PM
11:25:55 PM  11:25:56 PM

JA470 (citing Ofc. Hayes footage in JA Vol IV at 11:25:49-25:56).

Escobedo also testified that he believed Carson could be armed based on five factors: possible marijuana possession because people who possess drugs are usually armed, JA297, the stop's location, Carson's nervousness, his criminal history, and his involvement in the Aston Garden complaint investigation. JA297, JA311-313.

Escobedo believed that the intersection where the stop occurred was "a higher crime area." JA311. At the time, he had worked seven and a half years for the Asheville Police Department with five of those as a public housing officer and the rest as a senior police officer. JA287. Escobedo explained that he considered South French Broad Avenue to be high-crime because the police department received "one or two" high priority reports a week from the Aston Garden public housing complex, which resided on South French Broad. JA289. He did not identify a particular timeframe for his estimates, *id.*, but city crime data showed that in the three months preceding the stop, the Aston public housing complex had merely four narcotics violations and no incident of violent crime. JA480-482. And the specific intersection where Carson's traffic stop occurred had a single incident in the prior three months, which was for mere drug paraphernalia possession. JA481.

Escobedo also claimed that Carson acted nervously. Specifically, he appeared nervous and responded to questioning unusually by whispering. JA312-

313. And though Escobedo believed Carson was shaking as he exited the car, he acknowledged that his body-worn camera footage did not corroborate this. JA312, JA320.

Escobedo also relied on Carson's criminal history report and his involvement in the Aston Garden complaint investigation. JA311-312. The criminal history report included the decade-old arrest warrants and the "alert" for violent offender. JA306-307, JA340. While Escobedo said he saw a correlation between this alert and an offender's violent activities or criminal history, JA328, he did not know what triggered the alert. JA324. Because the alert listed "no expiration date[,]" Escobedo agreed that the label could apply to Carson when he is 80 years old. JA325-326. And, as to the prior investigation, Escobedo acknowledged that he only saw "Carson, among other individuals, in the [parking lot]" and did not witness Carson committing any activities he suspected to be criminal. JA328-329.

## J.     The court denies Carson's suppression motion.

Following the hearing, the magistrate judge issued a report concluding that Carson's seizure and search were reasonable and recommended denying suppression. JA431-454. The magistrate judge found that Corthell's written report and related testimony were "problematic" and had "troubling" "inaccuracies." JA444-446. Nevertheless, it concluded that Corthell did not violate *Rodriguez* and Escobedo had reasonable suspicion to frisk Carson. JA444-453.

As to the stop, the magistrate judge concluded that Corthell diligently pursued the traffic violation until he diverted to obtaining a narcotics-detection dog, because Corthell's inquiries in his patrol vehicle were all "tasks associated with an ordinary traffic stop." JA447.

But the magistrate judge reasoned that Corthell's efforts at obtaining a narcotics-detection dog were constitutional if, before that discussion, any officer at the scene had probable cause to search the car. JA447. It supplied no authority for this proposed standard. *Id.* But applying this standard, concluded Corthell did not impermissibly extend the stop because Hayes testified to smelling marijuana before Corthell exited his vehicle to speak with DeStefano. JA447-448.

As to the frisk, the magistrate judge's report concluded that Escobedo had reasonable suspicion to believe Carson was armed and dangerous. JA449-453. The magistrate judge did not credit Carson shaking or exhibiting nervousness in the calculus, because the assertion was not corroborated by Escobedo's body-camera footage. JA453 & n.13. But it did find reasonable suspicion based on Escobedo's knowledge of the following: Carson's criminal history report, his involvement in the prior investigation into a report of possible criminal activity, his pants felt weighed down, the stop occurred at night in an area presenting "heightened safety concerns," and the marijuana odor. JA450-453. As to the marijuana odor, the report cited this Court's presumption that reasonable suspicion drugs are present in a vehicle justifies a frisk. JA452 (citing *Sakyi*, 160 F.3d at 169).

After receiving an extension to the deadline, Carson timely filed objections to the magistrate's report and recommendation. JA455-489.

Carson argued that Corthell unreasonably extended the seizure because he failed to diligently pursue the suspended license violation and deviated from that violation to investigative ordinary criminal wrongdoing absent reasonable suspicion to do so.

Corthell knew he may perform a traffic stop and needed to be ready but he was not. JA473-474. For example, he did not know where his ticket book was, nor did he have the computer program running in his patrol vehicle to check a vehicle's registration. *Id.* So, rather than Corthell checking the vehicle's registration and having his citation book when he pulled the Highlander over, Carson and the other occupants had to sit and wait for him to boot up his computer and rummage about his vehicle. *Id.*

Inside his vehicle, Corthell engaged in unrelated inquiries, including researching unnecessary statutory subsections, checking the registered owner's information absent knowledge that owner was present, and investigating if the Highlander was involved in a past crime. JA467. And an officer diverting from the traffic violation to investigating possible drug activity with a canine officer is the very behavior the Supreme Court found unconstitutional in *Rodriguez*. JA467-468. Not only did such behavior occur here, but Corthell testified it was "[n]ormal" procedure. JA467 (citing JA236).

Contrary to the magistrate judge's analysis, Corthell's detour to investigate unrelated matters could not be justified by knowledge he did not possess. JA469-472. Preliminarily, Carson objected to the finding that Hayes smelled marijuana at 11:25:52 PM because his testimony was not based on personal recollection but a mistaken assessment of when body camera footage showed his nose parallel with the back window. JA469-471. But, regardless, Carson cited to this Court's *Massenburg* decision, which precludes imputing knowledge possessed by one officer to another officer absent some communication between the two. JA471-473. Because Hayes' detection of a marijuana odor was not communicated to Corthell before he detoured from the suspended license investigation, it cannot be used to find reasonable suspicion existed justifying Corthell's unrelated investigation. *Id.*

As to the frisk, Carson argued that there was no reasonable suspicion that he was armed and dangerous. JA475-486. The weight of his pants did not factor into the calculus as it was obtained after the physical intrusion onto his person. JA476-477. The location presenting heightened safety concerns was not supported with specific articulable facts but instead rested on conclusory testimony about bystanders generally and nearby public housing complexes. JA477-481. Carson's decade-old criminal history and presence in a recent investigation revealing only lawful behavior, likewise, do not support a reasonable belief he was armed. JA481-

23

486. And the marijuana odor did not supply a reasonable belief that Carson may be armed, given the totality of the circumstances. JA484-485. Those circumstances included the public's acceptance of marijuana use generally, as well as the practice of the officers at the traffic stop to not enforce marijuana laws against personal use. *Id.*

### K. The district court denied Carson's suppression motion and Carson enters into a conditional plea agreement and is sentenced.

Carson's objections were overruled, and the court denied the suppression motion. JA490-495.

The court found that researching the Highlander's registered owner absent knowledge she was present and the Highlander's involvement in any past crimes "served the same objective as enforcement of the traffic code," and thus were categorically permitted. JA491 (bracketing and quotations omitted). It also found that the government presented an "unclear timeline of events at the scene." JA492-493. But this uncertainty was "immaterial" since a marijuana odor was detected "only a few minutes after the stop was initiated," so "the duration of [Carson's] roadside detention does not implicate his constitutional rights." JA492. In so finding, the court stated: "it is clear that while Corthell was writing the traffic citation, another officer detected the smell of marijuana." JA492 (citing JA238-240). This assertion contradicted—without explanation—the magistrate judge's findings (and related testimony) that Corthell did not even know his ticket book's

location at that point. *Compare* JA492 *with* JA212-213, JA239, JA248, JA439, JA446.

The court failed to address whether Corthell's diversion into obtaining a narcotics-detection dog resulted in any period of detention not justified by probable cause or reasonable suspicion. JA491-493. Instead, it summarily found no *Rodriguez* violation occurred because "officers developed probable case (i.e., the small of marijuana coming from inside the vehicle) within the time reasonably required to issue the traffic citation." JA491-492. In doing so, the court cited, without further explanation, *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). JA491-492. But *Palmer* involved a motorist stopped by a lone officer, who while investigating the traffic violations prompting the stop, smelled marijuana that prompted him to begin investigation drug activity. 820 F.3d at 644-46. Unlike *Palmer,* Corthell did not smell marijuana while investigating the suspended license violation and prior to investigating drug activity, nor did Hayes begin a drug investigation after smelling marijuana.

As to the frisk, the court found it constitutional with a one-paragraph analysis that relied on *Sakyi* to conclude that the mere smell of marijuana authorized frisking Carson for weapons. JA493. No circumstance other than the odor's presence was examined. *See* JA493.

Following the suppression denial, Carson agreed to plead guilty to possessing a firearm as a convicted felon but preserved his right to appeal the district court's order denying his suppression motion. JA568-574. The court accepted this plea, JA537-540, and sentenced him to 24 months in prison, JA560-561. Following entry of his judgment, Carson timely filed a notice of appeal. JA567.

## Summary of Argument

During a traffic stop for a driver with a suspended license, law enforcement violated the Fourth Amendment by unreasonably extending Carson's seizure and unreasonably searching his person for weapons.

Corthell was justified in investigating Washington's suspended license, which included determining whether to issue a citation, attend to any related safety concerns, and engage in ordinary inquiries with a close connection to roadway safety. *Rodriguez*, 575 U.S. at 354-55. If Corthell added any time to the traffic stop by investigating matters unrelated to Washington's suspended license, the Fourth Amendment requires consent or reasonable suspicion of other criminal activity.

Corthell exceeded the authority for his traffic stop when he investigated whether the SUV had ever been used in a past crime, researched the registered owner's criminal history without knowing if the owner was present, and attempted to obtain a narcotics-detection dog. This detoured from the suspended license

26

violation into investigating ordinary criminal wrongdoing. And because the time Corthell spent on this unrelated investigation was time he did not spend addressing Washington's suspended license, it necessarily added time to the stop.

When Corthell added time to the stop to investigate matters unrelated to Washington's suspended license, he did not have consent or reasonable suspicion of other criminal activity. The fact that another officer smelled marijuana during the stop does not alter this conclusion, because whether Corthell had reasonable suspicion to extend the stop, as he did, does not consider Hayes' detection of a marijuana odor. This Court will only impute one officer's knowledge to another if the knowledgeable officer instructed or alerted the other officer to act. *Massenburg*, 654 F.3d at 492-93. Hayes gave no instruction or alert to Corthell, so Hayes' knowledge cannot be imputed to him. As a result, Corthell impermissibly extended the stop in violation of *Rodriguez* and the Fourth Amendment.

Escobedo could frisk Carson only if "a reasonably prudent" person in their circumstances "would be warranted in the belief that [their] safety or that of others was in danger." *Terry*, 392 U.S. at 27. No such belief was warranted here, where the circumstances of the stop and Carson's known characteristics did not suggest Carson presented a threat and the suspected crime was merely marijuana possession. The stop occurred in an unremarkable location for a minor traffic violation, where police outnumbered the occupants, who were all cooperative.

Although Carson had prior convictions for armed robbery, kidnapping, and burglary, the convictions were over a decade old and Escobedo recently surveilled Carson without observing any suspicious conduct. And though there was a marijuana odor in the SUV, marijuana possession is a low-level Class 3 misdemeanor requiring any prison sentence be suspended, which Asheville police generally decline to charge.

Under these circumstances, there was no reasonable suspicion that Carson was armed and dangerous. If reasonable suspicion exists based on this Court's presumption that reasonable suspicion to believe drugs are present in a vehicle also supplies reasonable suspicion that any occupant is armed and dangerous, it should be revisited where the suspected drug is marijuana. The presumption is contrary to both the Fourth Amendment's reasonableness requirement that eschews bright-line rules and modern realities on marijuana acceptance.

**Standard of Review**

This Court "review[s] the factual findings underlying the district court's motion to suppress for clear error and its legal conclusions de novo." *United States v. Medley*, 34 F.4th 326, 332 (4th Cir. 2022). In doing so, the evidence is viewed in the light most favorable to the prevailing party below. *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015).

**Argument**

**I.  The traffic stop violated Carson's Fourth Amendment rights.**

Corthell exceeded the bounds of a lawful traffic stop when he neglected the suspended license violation to pursue an unrelated criminal investigation. Contrary to the district court's ruling, researching the stopped car's involvement in past crimes and historical information on the non-operating registered owner, whose location is unknown, are not ordinary inquiries inherent to the stop's mission. Corthell needed reasonable suspicion of other criminal activity to investigate those unrelated matters and attempt to procure a narcotics-detection dog. Such suspicion did not exist and cannot be supplied by another officer's uncommunicated odor detection that was only learned about after the detour occurred.

**A.  An officer conducting a pretextual stop may not lengthen the seizure by conducting an unrelated investigation absent independent reasonable suspicion.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons…against unreasonable…seizures, shall not be violated." U.S. Const. amend. IV. Traffic stops seize everyone in the vehicle, *Brendlin v. California*, 551 U.S. 249, 251 (2007), so they must be reasonable, *Whren v. United States*, 517 U.S. 806, 809 (1996). To be reasonable, a traffic stop must be "justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004).

Traffic stops must remain limited in scope: "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. Such an investigation includes "determining whether to issue a traffic ticket[,]" "attend[ing] to related safety concerns[,]" and engaging in "ordinary inquiries" with a "close connection to roadway safety" that are incidental to the stop. *Id.* at 354-56. The Supreme Court identified only three "ordinary inquiries": checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 355. These inquiries are permissible because, like the traffic code itself, they "ensure that vehicles on the road are operated safely and responsibly." *Id.*

A traffic violation investigation does not include "measure[s] aimed at detecting evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 355 (quotations and bracketing omitted). "On-scene investigation into other crimes…detours from [the traffic stop's] mission." *Rodriguez*, 575 U.S. at 356. Accordingly, any investigation into other crimes that "prolongs—i.e., adds time to—the stop" is unreasonable "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355, 357 (quotations omitted).

Nor may the officer "slow walk" the traffic violation investigation to effectuate an unrelated investigation. *United States v. Podbielski*, No. 22-4084, 2023 WL 4888866, at *5 (4th Cir. Aug. 1, 2023). The officer "must be reasonably

diligent and must use the least intrusive means reasonably available." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (quotations omitted).

An officer's decision to add time to the traffic stop by investigating other crimes must be justified at its inception. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (customs officials needed reasonable suspicion to subject international traveler to border-detention beyond the ordinary). This means an officer must have reasonable suspicion of other criminal activity before detouring into investigating unrelated crimes. *See United States v. Miller*, 54 F.4th 219, 228-32 (4th Cir. 2022) (officer needs reasonable suspicion at the time he extends the stop). *Accord United States v. Baker*, 108 F.4th 1241, 1248 (10th Cir. 2024); *United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023); *United States v. Whitley*, 34 F.4th 522, 531-32 (6th Cir. 2022); *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

In sum, "an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *Baker*, 108 F.4th at 1248. As will be explained next, this 3-part test is met here.

**B. Corthell added time to the seizure by investigating matters unrelated to the suspended license violation absent reasonable suspicion.**

Instead of addressing the suspended license violation that justified the traffic stop with reasonable diligence as the Fourth Amendment demands, Corthell detoured from Washington's suspended license violation to investigate criminal activity generally. This added time to the stop, since the time he expended on those investigations was time not spent addressing suspended license violation. And Corthell detoured into the unrelated investigations with neither consent from those seized, nor reasonable suspicion of any other criminal activity.

**1. During the stop, Corthell researched the criminal history of the vehicle and non-operating owner and attempted to obtain a narcotics-detection dog.**

The stop was justified by Washington's suspended license violation. *Rodriguez*, 575 U.S. at 354. This authorized Corthell to determine whether to issue Washington a ticket, ascertain whether he had any outstanding warrants, check the vehicle's registration and proof of insurance, and potentially run a criminal history check, before writing the citation or issuing the warning. *Id.* at 354-56.

Corthell detoured from his suspended license mission when he investigated three unrelated matters: (1) researching whether the Highlander was involved in any past crimes; (2) checking the registered owner's driving status, warrant status, and criminal history, without knowing if that owner was present; and (3)

32

discussing getting a narcotics-detection dog to the scene. JA199, JA205, JA209, JA211, Ofc. DeStefano at 23:27:33-23:27:59. None of these three tasks fell within the scope of the traffic stop for Washington's suspended license violation.

Whether a vehicle was involved in a past crime provides no assistance to an officer investigating a present driver's license violation. The information is of no utility in deciding whether to issue the driver a ticket for a suspended license or in assessing the vehicle's ability to operate safely. Nor does the officer possessing such information make him or her safer. For example, say the Highlander was involved in a driving while intoxicated incident in 2020. Knowing this information does not further the investigation into whether its driver in 2023 complied with licensure laws, it does not suggest any safety issue with the Highlander's driving capacity, and it does not make the stopping officer any safer. Because information on whether the Highlander was involved in a past crime did not relate to the suspended license violation, officer safety concerns, or the Highlander's ability to be operated safely, Corthell detoured from the suspended license violation by performing this query. *Compare United States v. Leon*, 80 F.4th 1160, 1163-65 (10th Cir. 2023) (stopping officer detoured from the improper lane change investigation by asking about the car's mileage).

Courts are currently divided on whether inquiries into a passenger's identification information and criminal history ordinarily fall within the scope of a

33

traffic stop. The Ninth Circuit has found that an officer's demands for a passenger's identifying information violated the scope of a traffic stop for speeding, *United States v. Landeros*, 913 F.3d 862, 868-70 (9th Cir. 2019), whereas the Eighth Circuit has found checking a passenger's criminal history is a permissible "routine traffic-related task[,]" *United States v. Cox*, 992 F.3d 706, 708-11 (8th Cir. 2021). And the Third Circuit takes a flexible approach permitting such checks only "when necessary in order to complete the mission of the traffic stop safely[.]" *United States v. Hunter*, 88 F.4th 221, 226 (3d Cir. 2023) (quotations omitted).

This Court has not directly addressed the split, but its precedent suggests alignment with the Third Circuit's flexible approach. *See United States v. Hill*, 852 F.3d 377, 379-83 (4th Cir. 2017). In *Hill*, this Court found a stop that included checking a passenger's criminal history consistent with *Rodriguez*, where the stopping officer identified specific facts suggesting the passenger's potential recent involvement with violent crime. There, two officers stopped a car with two occupants with one checking the passenger's criminal history after recognizing the driver as someone associated with potential robbers and the passenger as the victim in a recent stabbing. *Id.* at 379-80. In other words, this Court approved checking a passenger's criminal history where specific articulable facts supported finding such a check was a reasonably necessary safety precaution.

But unlike *Hill*, Corthell identified no particular facts suggesting that any passenger presented a safety concern. Officers outnumbered the occupants and Corthell admitted that he "expedite[s]" stops for his safety. JA193. Ofc. DeStefano at 23:25:13-23:26:32. Most importantly, the record does not even demonstrate that Corthell knew the registered owner was present, let alone that the owner presented a safety concern. Corthell never asked for any passenger's identification information and testified only to a "vague" recollection of the Highlander's registration that he "believe[d]" "closely matched" the individual in the front passenger seat. JA198-199, JA201. Under these circumstances, investigating the registered owner's criminal history "was, if anything, inversely related to officer safety[,]" since it prolonged Corthell's exposure to the occupants and any potential bystanders. *Landeros*, 913 F.3d at 868. The inquiries into the registered owner during this stop therefore detoured from the traffic stop's mission.

But Corthell's most blatant unrelated investigation concerned an attempt to obtain a narcotics-detection dog. This attempt is the quintessential measure aimed at "detecting evidence of ordinary criminal wrongdoing[,]" that *Rodriguez* forbids absent independent reasonable suspicion. *Rodriguez*, 575 U.S. at 355 (quotations and bracketing omitted). Corthell's efforts to obtain a narcotics-detection dog are clearly outside the scope of the suspended license investigation he was authorized to conduct. *Frazier,* 30 F.4th at 1173 (trooper's efforts to arrange for a drug-

sniffing dog violated *Rodriguez*). *See also United States v. Anguiano*, 791 F.App'x 841, 850 (11th Cir. 2019) (discussing strategies to search car fell outside the scope of a stop for a traffic violation).

### 2. Corthell's actions added time to the stop, because he paused the citation-issuing process to investigate the unrelated matters.

Corthell engaging in these detours—researching the Highlander's involvement in past crimes, the registered owner's criminal history, and discussions on obtaining a narcotics-detection dog—added time to the stop. The time Corthell spent on these unrelated investigations "was time the citation-related tasks went unaddressed[,]" which "necessarily prolonged the stop." *Frazier*, 30 F.4th at 1173. *Accord United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022) ("Any break in [the traffic stop's] mission taints the stop because it is the result of an unreasonable delay."); *United States v. Williams*, No. 22-10052, 2023 WL 5925893, *3 (9th Cir. Sept. 12, 2023) ("any time" officers spent on the unrelated marijuana investigation "was time the mission's tasks went unaddressed, which necessarily prolonged the stop").

Although an officer could theoretically investigate both a traffic violation and an unrelated matter simultaneously, the record forecloses such a finding here. Corthell admitted to conducting separate inquiries for Washington's information, the Highlander's criminal history, and the registered owner's information, JA209.

Corthell also admitted that he forsook locating his ticket book, which was needed to continue addressing the suspended license, to discuss obtaining a narcotics-detection dog. JA210-212. Consequently, the time Corthell spent on his detours necessarily prolonged the stop by that amount of time. Whether the time spent on the detours was short is irrelevant. *See e.g.,* Ofc. DeStefano at 23:27:33-23:27:59 (about 25 seconds lapsed from Corthell approaching DeStefano to have the discussion and returning to his car). "[E]xtending a stop by even a de minimis length of time violates the Fourth Amendment." *Hill*, 852 F.3d at 381. *See also Campbell*, 26 F.4th at 885 (25 seconds spent questioning the driver about crime in general "extended the stop" by that length).[4]

---

[4] The district court found the government presented an "uncertain timeline of events at the scene" and thus failed to make specific findings on the chronology of events or rule on particular timing objections lodged by Carson. JA492. But, to the extent the district court's finding that "Corthell was writing the traffic citation" when Hayes smelled marijuana reflects a finding on the timing of Corthell's traffic stop investigation, it is clearly erroneous. *See Jiminez v. Mary Washington College*, 57 F.3d 369, 379 (4th Cir. 1995) (a factual finding may be set aside as clearly erroneous if it is either "not supported by substantial evidence" or "contrary to the clear weight of the evidence"). Corthell admitted he was not writing a citation when discussing the narcotics-detection dog and did not even know his ticket book's location at that moment. JA212-213, JA239, JA248. The record does not support any contrary finding.

### 3. When Corthell began his unrelated investigations he had neither consent, nor reasonable suspicion of other criminal activity.

Corthell's detour into investigating unrelated matters must be "justified at its inception…." *Terry*, 392 U.S. at 19. To be justified, Corthell needed consent, *Hill*, 852 F.3d at 382, or "the reasonable suspicion ordinarily demanded to justify detaining an individual[,]" *Rodriguez*, 575 U.S. at 355. There is no suggestion or support in the record for Corthell obtaining consent to prolong the traffic stop. Nor did reasonable suspicion exist.

Reasonable suspicion requires the officer "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21. "[T]he officer must have had a reasonable suspicion at the time" the stop was prolonged to investigate other matters. *Miller*, 54 F.4th at 228. "[O]nly those facts known to the officer at the time" of extension are considered. *Id.*

Here, Corthell identified no particular fact suggesting other criminal activity, when he detoured from the suspended license violation to investigate unrelated matters. In fact, while investigating the third unrelated matter, getting a narcotics-detection dog, Corthell admitted to seeing nothing incriminating in the car. Ofc. DeStefano at 23:27:40-23:27:59.

Although the record suggests Corthell learned additional information on possible drug activity after discussing getting a narcotics-detection dog, this information is not considered in determining if reasonable suspicion existed to authorize the detour. "[This Court] consider[s] only those facts known to the officer at the time" the officer detoured from the traffic stop mission to investigate other matters. *Miller*, 54 F.4th at 228. *Accord Frazier*, 30 F.4th at 1178 (reasonable suspicion to justify a detour from a traffic stop mission cannot include facts learned after the officer embarked on the detour); *United States v. Green*, 897 F.3d 173, 181-82 (3d Cir. 2018) (same). When Corthell investigated matters unrelated to Washington's suspended license, he lacked the requisite suspicion necessary to justify Carson's continued detention during this detour. As will be explained next, Hayes' sense of smell does not change this conclusion.

C. **Analyzing whether Corthell had reasonable suspicion cannot, under controlling precedent, consider Hayes' uncommunicated observations.**

Rather than examine whether Corthell possessed reasonable suspicion to justify his detour as precedent required, the district court instead relied on Officer Hayes smelling marijuana to uphold the stop. JA491-492. In doing so, the court failed to provide any authority for its approach, *id.*, which contravenes this Court's precedent limiting when one officer's knowledge may be imputed to another officer.

While the collective knowledge doctrine permits imputing one officer's knowledge to another officer, this Court limits its application to only those instances where there was some communication or alert between the two officers. *Massenburg*, 654 F.3d at 492-96. Hayes needed to communicate an alert or instruction to Corthell for him to rely on Hayes' knowledge to justify his detour. Hayes did not communicate any alert or instruction to Corthell prior to the investigative detour, so the marijuana odor cannot be considered in determining whether Corthell had reasonable suspicion justifying his detour.

\*     \*     \*

Carson was seized when the Highlander he was riding in was stopped by Corthell for a driver with a suspended license. During the stop, Corthell paused the suspended license investigation to investigate if the Highlander was an instrumentality in a past crime, the registered owner's criminal history absent knowledge that owner was present, and attempting to obtain a narcotics-detection dog. Because Corthell's investigations unrelated to the suspended license violation added time to the stop, he needed consent or reasonable suspicion to justify his detour. He had neither, so Carson was unreasonably seized in violation of the Fourth Amendment. The district court's decision finding otherwise should be reversed.

**II.     The frisk violated Carson's right against unreasonable searches.**

A *Terry* frisk occurs when an officer pats a suspect's outer clothing in an attempt to find weapons and it qualifies as a search. *Terry*, 392 U.S. at 16. "The purpose of [this] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). *Terry* frisks, like all searches, must be reasonable to pass constitutional muster. U.S. Const. amend. IV.

A *Terry* frisk is reasonable if the officer has "reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Reasonable suspicion exists when "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* at 21. This Court "examine[s] the totality of the circumstances to determine if the officer[,]" from an objective standpoint, "had a particularized and objective basis for believing that the detained suspect might be armed and dangerous." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (quotations omitted). In doing so, the Court "separately address[es]" the individual articulated facts, before considering them under the totality of the circumstances. *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018).

**A.** **Carson's presence in a vehicle with a marijuana odor and his decade old convictions did not present a reasonable suspicion that he was armed and dangerous, under the circumstances of this stop.**

The district court applied the *Sakyi* presumption that the mere odor of marijuana supplied a reasonable belief that Carson was armed and dangerous. JA493. But here, the totality of the circumstances refuted that a reasonably prudent officer would believe that Carson was armed and dangerous, where the stop's features, Carson's characteristics, and the suspected criminal activity did not suggest the officers were in danger.

A search "undoubtedly occur[s]" when "the Government obtains information by physically intruding on a constitutionally protected area…." *United States v. Jones*, 565 U.S. 400, 406 n.3, 414 (2012). Carson's *Terry* frisk thus began no later than when Escobedo first physically touched him.[5] This first physical contact occurred seconds after Escobedo ordered him out of the car, before pulling up Carson's pants, when Escobedo touched his back. Det. Escobedo at 23:29:07. At this point, Escobdeo needed to have "specific and articulable facts" justifying a reasonable belief that Carson was armed and dangerous. *Miller*, 54 F.4th at 228.

---

[5] There is disagreement over whether a frisk may start before a physical intrusion. *Compare Doornbos v. City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017) (frisk begins "when a reasonable person would have believed that the search was being initiated") *with United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) (*en banc*) (physical intrusion begins frisk regardless of suspect's beliefs). But this controversy is not implicated here, where the reasonable suspicion analysis is materially the same under either approach.

Three of the observations Escobedo testified about should not be considered in the analysis, including feeling a heavier object in Carson's pants, Carson's apparent nervousness, and the stop occurring in a high-crime area. Because Escobedo felt the heavy object during the frisk, it cannot be used to justify the frisk itself. *Miller*, 54 F.4th at 228. The magistrate judge declined to credit Escobedo's testimony on Carson's apparent nerves, finding it was not supported by the bodycamera footage. JA453. *See also Miller*, 54 F.4th at 229 ("when an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements").[6] Similarly, the magistrate judge did not find that the stop occurred in a high-crime area, instead finding, based on the cumulative testimony by all officers, that the area merely presented "heightened safety concerns." JA452-453. The court did not elaborate on what "heightened safety concerns" meant, but most of the officers' testimony centered on bystanders presenting a potential threat, which is not relevant to whether a vehicle occupant presents a danger.

A conclusion that this stop occurred in a "high-crime" location is not supported by the record. Escobedo offered no details to support his "high-crime" label aside from vicinity to a public housing complex and generalized testimony

---

[6] And, in any event, most people exhibit nervousness when confronted by a gaggle of armed law enforcement officers, so its presence is of little utility in the reasonable suspicion calculus. *Bowman*, 884 F.3d at 214-15.

that police were called to the complex, which was contradicted by city crime data in the months leading up to the stop. *Compare* JA289 *with* JA480-482. This Court rejected an officer's "conclusory testimony" that a second handshake was a narcotics transaction, where the officer failed to provide "any details about the handshake that allow[ed] [it] to view th[e] second handshake as suspicious." *United States v. Drakeford*, 992 F.3d 255, 264 (4th Cir. 2021). "Blind acceptance of police testimony" labeling an area "high-crime" "creates an unjustified risk of arbitrary and discriminatory policing." *United States v. Weaver*, 9 F.4th 129, 156 (2d Cir. 2021) (Lohier, J., concurring in the result) (en banc). Indeed, one study found that "[o]fficers call nearly every block in the city high crime at one time or another" with the data suggesting a stronger correlation to a suspect's race, rather than actual crime rates. Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 Cal. L. Rev. 345, 349-51 (2019). This Court should follow *Drakeford* by rejecting Escobedo's conclusory assertion that the stop occurred in a high-crime area.

In assessing reasonable suspicion, the facts known to Escobedo were that law enforcement was addressing a suspended license, officers outnumbered the occupants 2:1, Carson had prior convictions for robbery, kidnapping, and burglary from over a decade ago, Carson was observed in the weeks prior doing nothing

suspicious, and there was a marijuana odor in the vehicle.[7]  These facts do not

supply a reasonable belief Carson was armed and dangerous.

This was a routine traffic stop for a suspended license violation, in an

unremarkable location with six officers outnumbering the three occupants. These

attributes all weigh against Escobedo facing a threat in assisting with the stop.

*Compare United States v. Powell*, 666 F.3d 180, 187 (4th Cir. 2011) (routine

traffic stop, not in a high-crime location, where officers outnumbered the

occupants, who were compliant, did not support a reasonable belief that an

occupant was armed and dangerous).

Carson's past convictions offer little support for a reasonable belief that he

was presently armed and dangerous due to their temporal remoteness. While a

person's criminal record can be relevant in establishing reasonable suspicion, the

"specificity of the information" is significant in determining the relevancy. *Powell*,

666 F.3d at 188. Here, Escobedo knew that Carson was convicted for armed

robbery, burglary, and kidnapping more than a decade ago. A person's character

can change—an act committed by someone at 22 years old is not a reliable

predictor of who that person is at 33 years old. Escobedo "was required to pair

---

[7] Although Escobedo heard Hayes say a scale was present, a scale should not be included because Hayes only had a hunch at that time. The bodycamera footage merely showed a small rectangular object and Hayes' contemporaneous admission that he merely "thought" the object was a scale.

knowledge of [Carson's] criminal record with some more concrete factors to demonstrate that there was a reasonable suspicion of current" danger. *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011). But no such concrete factors bolster Carson's old criminal history.

Escobedo's prior surveillance offered no support for a reasonable belief Carson was armed, since he admitted to never observing Carson engage in suspicious behavior. *Compare Drakeford*, 992 F.3d at 264-65 (surveillance not revealing any suspicious behavior did not elevate officers' hunch into reasonable suspicion).

And finally, the marijuana odor only supplied, at most, a belief that nonviolent, low-level offense may be occurring.[8] Possessing under half an ounce of marijuana is a Class 3 misdemeanor, where any sentence of imprisonment must be suspended. N.C. Gen. Stat. Ann. § 90-95(d)(4). Other Class 3 misdemeanors include driving a car with windows tinted too darkly, driving 81 mph on a highway with a 70-mph speed limit, neglecting to clean a license plate after being asked to do so, or removing a shopping cart from the shop's premises. N.C. Gen. Stat. §§

---

[8] And the odor may not even supply a reasonable belief that a criminal activity is afoot. This Court currently has a case pending challenging this premise because the odor of illegal marijuana and legal hemp is indistinguishable. *See United States v. Darrell Harris*, Case No. 24-4509. If a marijuana odor does not supply a reasonable belief that illegal drugs are present, then the condition triggering *Sakyi*'s presumption in this case falls away.

20-127(d), 20-141(j1), 20-63(e), 14-72.3. Indeed, DeStefano assured the driver in this very case that they did not care about simple marijuana possession and that his practice was to confiscate-without-charging for simple marijuana possession. A reasonable officer would not infer danger, where the only suspected criminal behavior was of the nonviolent, minor variety. *Compare United States v. Wilson*, 506 F.3d 488, 494-96 (6th Cir. 2007) (frisking occupants in a traffic stop for a seatbelt violation, where one admitted to serving time on a federal gun charge was not reasonable).

The circumstances known to Escobedo do not, in their totality, establish a reasonable suspicion that Carson was armed and dangerous. To the extent the *Sakyi* presumption suggests otherwise, it should be revisited, at least as applied to reasonable suspicion of marijuana possession.

**B.** **The Court should reconsider *Sakyi*'s presumption that reasonable suspicion of drugs supplies reasonable suspicion an individual is armed and dangerous, when the only suspected drug is marijuana.**

If the Court concludes that the facts here do not rebut *Sakyi*'s presumption of dangerousness, then it should reconsider whether that presumption is reasonable when police merely have reasonable suspicion of marijuana possession. The *Sakyi* presumption is contrary to the Supreme Court's Fourth Amendment jurisprudence and modern society's views on marijuana use.

The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "[R]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances. In applying this test [the Supreme Court has] consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The *Sakyi* presumption is contrary to these principles by erecting a bright-line rule, the purpose of which is to excuse the government from meeting its burden of establishing a warrantless search's reasonableness, which increases the likelihood an unreasonable search will go undetected.

Just a few years ago, the Court rejected an invitation to adopt a categorical Fourth Amendment rule because any overbreadth in this context is unacceptable. *See Lange v. California*, 594 U.S. 295, 302-08 (2021). In *Lange*, the Court declined to hold that exigent circumstances exist whenever a suspected misdemeanant flees from police into his or her home. *Id.* Although there are undoubtedly "a great many cases" of misdemeanant flight that would supply exigent circumstances, there was "no evidence suggest[ing] that every case of misdemeanor flight pose[d]" such a need. *Id.* at 307. Any "overbreadth" in a bright-line rule excusing the Fourth Amendment's warrant requirement is "fatal." *Id.* at 308.

Like *Lange*, no evidence suggests that mere marijuana use or possession is always or even usually accompanied by firearms. The rationale underlying *Sakyi*'s presumption was that "guns often accompany drugs." 160 F.3d at 169 (citing *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997) ("As we have often noted, where there are drugs, there are almost always guns."); *United States v. Perrin*, 45 F.3d 869, 873 (4th Cir. 1995) ("it is certainly reasonable for an officer to believe that a person engaged in the selling of crack cocaine may be carrying a weapon for protection"). *Sakyi*, *Stanfield*, and *Perrin* were, of course, decided during the height of the federal "war on drugs" in the 1990s and at a time when punishments for drug offenses, including marijuana offenses, were on the rise. *See* Ryan S. King and Marc Mauer, *The war on marijuana: the transformation of the war on drugs in the 1990s*, 3 Harm Reduct J. 6-17 (2006).[9] But whatever the merits of this rationale generally, it certainly does not hold water when the drug is marijuana in present times.

While a panel of this Court is ordinarily "bound by 'the basic principle that one panel cannot overrule a decision issued by another panel.'" *United States v. Williams*, 808 F.3d 253, 261 (4th Cir. 2015) (quoting *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc)). This principle gives way when the prior decision "rests on authority that subsequently proves untenable." *Id.* (quoting

---

[9] Available at <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1420279/>.

*U.S. Dep't of Health Human Servs. v. Fed. Labor Relations Auth.*, 983 F.2d 578, 581-82 (4th Cir. 1992)). For example, in *Williams*, a panel of this Court rejected a prior panel decision because its logic was based on law that had since changed. *Id.* at 261. The same is true here: *Sakyi*'s logic is based on the premise that marijuana can only be obtained through criminal sources and that, therefore, "guns often accompany" its possession. 160 F.3d at 169 (citing *Stanfield*, 109 F.3d at 984; *Perrin*, 45 F.3d at 873). But this is simply not true anymore.

As a result of successful legalization efforts, an individual can walk into a business, which is licensed by the state government and pays taxes to the IRS, to acquire marijuana. Marijuana is widely available from sources blessed by state governments. [10] Forty-seven states and the District of Columbia allow medial marijuana use. Congressional Research Service, *State Marijuana 'Legalization' and Federal Drug Law: A Brief Overview for Congress*, (updated May 14, 2024).[11] Twenty-four states and the District of Columbia have repealed prohibitions on recreational marijuana use by adults over 21 years old. *Id.* Virginia, Maryland, and the Eastern Band of Cherokee Indians, whose territory resides in Western North

---

[10] See e.g., *Feinberg v. Comm'r of Internal Revenue*, 916 F.3d 1330, 1331 (10th Cir. 2019) (affirming tax deficiency order for Colorado marijuana dispensary).
[11] Available at < https://tinyurl.com/ycyjmfyc>. The three states where it is not permitted are Idaho, Kansas, and Nebraska. CDC, *State Medical Cannabis Laws*, available at < https://www.cdc.gov/cannabis/about/state-medical-cannabis-laws.html>.

Carolina, permit recreational marijuana use.[12] In other words, no longer do people need to acquire marijuana from a dark alley, they can instead acquire it from a licensed state business. Just as an individual does not feel going armed to a liquor store is necessary, nor does an individual feel weapons are needed to go to a licensed dispensary.

The deregulation of marijuana is a legislative reflection of modern society's view that marijuana is a tolerable vice, like alcohol and nicotine. Sixty-two million Americans, about 20% of the U.S. population ages 12 and older, reported using marijuana at least once in 2023.[13] And 87% of American adults think at least some marijuana usage should be legal, with over half supporting legalizing recreational use; over half of Americans said legalizing recreational would be good for local economies and over 40% said the move would make the criminal justice system fairer.[14]

---

[12] Elliott Davis Jr. & Marissa Yelenik, *Where is Weed Legal? A Guide to Marijuana Legalization* U.S. News (June 30, 2025), available at < https://www.usnews.com/news/best-states/articles/where-is-marijuana-legal-a-guide-to-marijuana-legalization>; Associated Press, *Sale and use of marijuana permitted under ordinance Cherokees in North Carolina approved* (June 7, 2024), available at <https://tinyurl.com/mr2zuts2>.

[13] Associated Press, *By the numbers: There are now more daily marijuana users in the US than daily alcohol users* (May 22, 2024), available at <https://tinyurl.com/4yaedsu9>.

[14] Anna Jackson & Katherine Schaeffer, *9 facts about Americans and marijuana*, Pew Research Center (July 8, 2025), available at <https://tinyurl.com/23d7scbv>.

Based on societal and legislative views on marijuana use, probable cause to suspect marijuana possession cannot always warrant a reasonable belief that the possessor is armed and dangerous. As a result, the *Sakyi* presumption excuses the government from its burden of justifying a warrantless search and permits unreasonable physical intrusions. A reasonable suspicion that marijuana is present should be one factor in the totality of the circumstances analysis and those circumstances may or may not supply a reasonable belief that a person is armed and dangerous.

*　　*　　*

Because there was no reasonable suspicion that Carson was armed and dangerous when Escobedo's frisk began, the district court's denial of the motion to suppress evidence obtained from the unreasonable search of Carson's person should be reversed.

## Conclusion

The district court denied Carson's suppression motion by finding that Carson was neither unreasonably seized during the traffic stop, nor unreasonably frisked. This denial should be reversed. Although Carson's seizure was justified by the suspected suspended license violation, this justification ended when Corthell deviated from addressing that traffic violation without reasonable suspicion of other criminal activity to investigate ordinary criminal wrongdoing. Similarly, the

district court's finding that Carson's presence in a vehicle with a marijuana odor supplied a reasonable belief that he was armed and dangerous is incorrect. The totality of the circumstances supplied no such reasonable belief. Simple marijuana possession is a very minor offense and neither the stop's circumstances, nor Carson's characteristics raised a specter of danger.

## Request for Oral Argument

Carson respectfully requests oral argument, because this case presents significant Fourth Amendment violations.

Date: August 15, 2025

Respectfully submitted,

John G. Baker,
FEDERAL PUBLIC DEFENDER FOR THE
WESTERN DISTRICT OF NORTH CAROLINA

/s/Melissa S. Baldwin
Melissa S. Baldwin
ASSISTANT FEDERAL PUBLIC DEFENDER
One Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992
Melissa_Baldwin@fd.org

*Counsel for Appellant*

**Certificate of Compliance**

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

     This document contains <u>11,177</u> words.

2.     This document complies with the typeface requirements because:

     This document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point <u>Times New Roman</u>

     Respectfully submitted,

     John G. Baker,
     FEDERAL PUBLIC DEFENDER FOR THE
     WESTERN DISTRICT OF NORTH CAROLINA

     <u>/s/Melissa S. Baldwin</u>
     Melissa S. Baldwin
     ASSISTANT FEDERAL PUBLIC DEFENDER
     One Page Avenue, Suite 210
     Asheville, NC 28801
     (828) 232-9992
     Melissa_Baldwin@fd.org

     *Counsel for Appellant*