IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 25-4200

———————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

JERMAINE DERRICK CARSON, JR.,

*Defendant - Appellant.*

———————————

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Martin Reidinger, Chief Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Russ Ferguson     Amy E. Ray
United States Attorney   Assistant United States Attorney
           United States Courthouse
           100 Otis Street, Room 233
           Asheville, North Carolina 28801
           (828) 271-4661

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED .........................................................................1

STATEMENT OF THE CASE ...............................................................2

    A.    Carson, a convicted felon, possesses a firearm that police discover when frisking him during a traffic stop, after the police developed probable cause to search the car ......................................................................................2

    B.    Carson pleads guilty to a firearm offense after the district court denies Carson's motion to suppress, and the district court sentences him to 24 months in prison......18

SUMMARY OF THE ARGUMENT .......................................................23

ARGUMENT

I.    The district court properly found that the Fourth Amendment authorized Carson's detention .......................................................25

    A.    Standard of Review .............................................................25

    B.    Discussion..........................................................................26

II.    Reasonable suspicion that Carson could be armed and dangerous justified Escobedo's frisk of Carson ...........................37

    A.    Standard of Review .............................................................37

        B.     Discussion.............................................................................37

CONCLUSION ..................................................................................46

REQUEST FOR DECISION ON THE BRIEFS WITHOUT
        ORAL ARGUMENT ...........................................................46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Johnson,*
  555 U.S. 323 (2009) .................................................................. 26, 27

*District of Columbia v. Wesby,*
  583 U.S. 48 (2018) .................................................................... 28, 29

*Grayson O Co. v. Agadir Int'l LLC,*
  856 F.3d 307 (4th Cir. 2017) ......................................................... 30

*Illinois v. Caballes,*
  543 U.S. 405 (2005) ....................................................................... 28

*Kaley v. United States,*
  571 U.S. 320 (2014) ....................................................................... 28

*Michigan v. Long,*
  463 U.S. 1032 (1983) ..................................................................... 27

*Ornelas v. United States,*
  517 U.S. 690 (1996) ....................................................................... 25

*Rodriguez v. United States,*
  575 U.S. 348 (2015) ........................................................... 27, 32, 35

*Terry v. Ohio,*
  392 U.S. 1 (1968) ........................................................................... 38

*United States v. Arvizu,*
  534 U.S. 266 (2002) ................................................................. 38, 41

iii

*United States v. Branch*,
537 F.3d 328 (4th Cir. 2008) .................................................. 27, 38, 41

*United States v. Brown*,
701 F.3d 120 (4th Cir. 2012) ........................................................ 26

United States v. *Caldwell*,
7 F.4th 191 (4th Cir. 2021) ........................................................... 28

*United States v. Foster*,
824 F.3d 84 (4th Cir. 2016) .......................................................... 38

*United States v. Frazer*,
98 F.4th 102 (4th Cir. 2024) ......................................................... 41

*United States v. Humphries*,
372 F.3d 653 (4th Cir. 2004) ........................................................ 29

*United States v. Massenburg*,
654 F.3d 480 (4th Cir. 2011) ........................................................ 36

*United States v. McCoy,*
773 F. App'x 164 (4th Cir. 2019) .................................................. 44

*United States v. Ortiz*,
669 F.3d 439 (4th Cir. 2012) ........................................................ 28

*United States v. Palmer*,
820 F.3d 640 (4th Cir. 2016) ............................................. 25, 29, 35

*United States v. Patterson*,
278 F.3d 315 (4th Cir. 2002) ........................................................ 26

*United States v. Perry*,
92 F.4th 500 (4th Cir. 2024) ......................................................... 44

*United States v. Purks,*
   139 F.4th 388 (4th Cir. 2025) ............................................................... 25

*United States v. Quarles,*
   330 F.3d 650 (4th Cir. 2003) ............................................................... 37

*United States v. Robinson,*
   744 F.3d 293 (4th Cir. 2014) ............................................................... 30

*United States v. Robinson,*
   846 F.3d 694 (4th Cir. 2017) ......................................................... 37, 38

*United States v. Rooks,*
   596 F.3d 204 (4th Cir. 2010) ............................................................... 39

*United States v. Sakyi,*
   160 F.3d 164 (4th Cir. 1998) ..................................................... 23, 39, 40

*United States v. Smart,*
   91 F.4th 214 (4th Cir. 2024) ............................................................... 28

*United States v. Turner,*
   122 F.4th 511 (4th Cir. 2024) ............................................................. 28

*United States v. Williams,*
   808 F.3d 253 (4th Cir. 2015) ............................................................... 44

## Statutes

18 U.S.C. § 922(g)(1) ............................................................................ 18

18 U.S.C. § 3231 ..................................................................................... 1

28 U.S.C. § 1291 ..................................................................................... 1

N.C. Gen. Stat. § 20-28 ........................................................................ 17

N.C. Gen. Stat. § 90-94 ........................................................................ 45

N.C. Gen. Stat. § 90-95(a) .................................................................. 45

N.C. Gen. Stat. § 90-95(b)(2) ............................................................. 45

## JURISDICTIONAL STATEMENT

Jermaine Derrick Carson, Jr., appeals the denial of his motion to suppress after conditionally pleading guilty to possessing a firearm as a convicted felon.   The district court's subject-matter jurisdiction derives from 18 U.S.C. § 3231, which affords district courts original jurisdiction of offenses against the laws of the United States.   The court entered its judgment on April 7, 2025, J.A. 560; Carson filed a timely notice of appeal two days later, J.A. 567.   This Court's jurisdiction is premised on 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.   Carson was a passenger in a car stopped because the driver's license was suspended.   Within three minutes of the stop and while the officer preparing the citation was in his patrol car, a second officer smelled marijuana in the car and discovered a digital scale.   Did the district court properly find that the resulting car search did not extend the traffic stop in violation of the Fourth Amendment?

II.   After the police developed probable cause to search the car, a detective recognized Carson as one of a group of individuals recently

suspected of drug trafficking and carrying firearms in a nearby public-housing development.   The detective was aware that Carson had a history of violent offenses, and he smelled marijuana when he removed Carson from the car.   Was the officer's frisk of Carson for weapons consistent with the Fourth Amendment?

## STATEMENT OF THE CASE

**A.     Carson, a convicted felon, possesses a firearm that police discover when frisking him during a traffic stop, after the police developed probable cause to search the car.**

In late April or early May of 2023, a property manager at the Aston Park Tower and Gardens complained to the police about criminal activity on the property's parking lot.   J.A. 35, J.A. 157–158, J.A. 176, J.A. 299–300, J.A. 322.   Aston Park is a public-housing development in Asheville, North Carolina, that serves primarily older residents.   J.A. 35, J.A. 157–158, J.A. 176, J.A. 299–300, J.A. 322.   The property manager reported that a group of young men had been frequenting the development's parking lot and appeared to be using it for drug trafficking.   J.A. 35, J.A. 157–158, J.A. 176, J.A. 299–300, J.A. 322.

2

The manager also reported seeing "people walking around with guns." J.A. 157, J.A. 299–300, J.A. 322.

The police, including Asheville Police Department Detectives Brad Beddow and Steven Escobedo, began conducting surveillance of the parking lot. J.A. 150, J.A. 158–159, J.A. 301. They undertook in-person surveillance. J.A. 150, J.A. 158–159, J.A. 301. And they monitored live feeds from surveillance cameras operated by the Housing Authority of the City of Asheville. J.A. 150, J.A. 158–159, J.A. 301.

Beddow and Escobedo observed Carson during this surveillance. J.A. 35, J.A. 301–302. They saw that Carson usually arrived in the parking lot in the backseat of a Toyota Highlander driven by Calvin Washington. J.A. 35, J.A. 159. A white woman was in the front passenger's seat when the detectives saw the three coming and going in the Highlander. J.A. 35. The detectives also observed activity consistent with the property manager's report of likely drug trafficking, though they did not see Carson engage in any activity they determined was illegal. J.A. 159, J.A. 302–304, J.A. 322–323, J.A. 328–329.

Investigating further, Beddow learned that Washington's driver's license was suspended.   J.A. 37, J.A. 160–162.   Escobedo searched Carson's criminal history and learned that it included armed-robbery, kidnapping, and burglary offenses.   J.A. 305, J.A. 308, J.A. 352, J.A. 354.   The criminal-history report also identified Carson as a "violent offender."   J.A. 43, J.A. 308, J.A. 325, J.A. 353.

On the night of May 20, 2023, members of Asheville Police Department's Impact Team collaborated with agents from North Carolina's Alcohol Law Enforcement agency to patrol the downtown area near outlets licensed to sell alcohol.   J.A. 40, J.A. 43, J.A. 99–101, J.A. 151, J.A. 166, J.A. 181–183, J.A. 252, J.A. 291.   The Impact Team conducted this operation because of a high number of recent crimes involving firearms in and around downtown bars.   J.A. 40, J.A. 43, J.A. 96–97, J.A. 151, J.A. 291.

Beddow was part of the operation and was stationed at a Shell gas station near the downtown area around 11:20 p.m. when he saw Washington arrive in the Highlander.   J.A. 35, J.A. 37, J.A. 104–105, J.A. 153, J.A. 155, J.A. 293.   He was also able to see the white woman,

4

later identified as Jordan Pressley.   J.A. 35, J.A. 112, J.A. 156.

Beddow could not see anyone else in the car because of the dark tint on

the Highlander's windows, J.A. 35, J.A. 156, but Carson was also in the

car, J.A. 110–112.   Washington went into the convenience store and

bought some beer, before returning to the car and driving toward

downtown.   J.A. 35, J.A. 37.

Beddow followed the car as Washington headed past downtown

and toward the Aston Park housing development.   J.A. 37.   Beddow

communicated with members of the Impact Team and suggested for

safety reasons that an officer stop the Highlander before Washington

could "get[] back to the Towers" where the traffic stop would become

more dangerous.   J.A. 166.   Another member of the team confirmed

that Washington's license was still suspended.   J.A. 167–168.

Agent Web Corthell with the Alcohol Law Enforcement agency

saw the Highlander cross Asheland Avenue and onto Phifer Street.

J.A. 40, J.A. 189.   Corthell, who was in a marked patrol car, got behind

the Highlander and confirmed that its license plate matched the license

plate of the Highlander Beddow had seen at the Shell station.   J.A. 40,

5

J.A. 189.   After crossing over onto Phifer Street, Washington "picked up speed and began driving in a more aggressive manner."   J.A. 40, J.A. 190–191.   Corthell saw the car "lean significantly to the left as it navigated the first curve on Phifer Street and cross over the centerline of the road."   J.A. 40, J.A. 191.

At 11:24:31 p.m., Corthell activated his blue lights and reported that he was pulling Washington over at the intersection of Phifer Street and South French Broad Avenue.   J.A. 37, J.A. 40, J.A. 109, J.A. 191–192, J.A. 267, J.A. 294.   That T-intersection is less than a half mile from Aston Park and a third of a mile from a second public-housing development.   J.A. 107–108, J.A. 267–268, J.A. 285.   Both developments are within walking distance of the traffic stop, and officers considered both developments to be high-crime areas.   J.A. 108–109, J.A. 193–194, J.A. 254, J.A. 268, J.A. 295.

Corthell stopped Washington before he could arrive at one of those developments because of the dangers police officers regularly faced when detaining individuals in them.   J.A. 197.   Corthell had personally experienced hostile traffic stops in that neighborhood that

6

included spectators yelling, screaming, and throwing bottles at him. J.A. 193. Escobedo and Asheville Police Department Detective Patrick DeStefano had served on the Department's public-housing unit and had responded to or investigated a "host of crimes" in both public-housing developments near the Phifer-South French Broad intersection. J.A. 97, J.A. 108–109, J.A. 289, J.A. 295. These crimes included homicides, shootings, and narcotics, trespassing, and assault offenses. J.A. 97, J.A. 108–109, J.A. 289, J.A. 295.

Corthell approached the driver's side of the Highlander and introduced himself before asking Washington for his driver's license. J.A. 40, J.A. 198, J.A. 217. Washington "shrugged his shoulders and indicated that he did not have it with him." J.A. 40. Corthell asked Washington if he had a driver's license, and Washington admitted that he did not. J.A. 40, J.A. 198. Corthell asked if he had any identification, and Washington handed over a North Carolina identification card. J.A. 40, J.A. 198–199.

DeStefano was shortly behind Corthell in his unmarked car and saw Corthell initiate his blue lights and pull Washington over. J.A.

7

104, J.A. 110, J.A. 198.   DeStefano approached the passenger's side of

the Highlander as Corthell was speaking with Washington on the

driver's side.   J.A. 110, J.A. 199.   The back passenger's-side window,

where Carson was sitting, was partially open, and DeStefano spoke

with Carson and Pressley while Corthell spoke with Washington.   J.A.

110–112.

Less than a minute into the traffic stop, after speaking with

Washington and obtaining his identification, Corthell returned to his

patrol car to verify Washington's identification, confirm the status of

the registration, and "enter[] all that information into CJLEADS," a

computer program that produces criminal histories.   J.A. 119, J.A. 199,

J.A. 218.   Because it had been some time since Corthell had last used

CJLEADS, he also had to complete a two-factor authentication process.

J.A. 200.   Corthell entered Washington's name and identification

number into CJLEADS.   J.A. 201, J.A. 209.   He looked for

Washington's address, date of birth, and information about why he did

not have a valid driver's license.   J.A. 203.   He also checked for any

active warrants and investigated Washington's criminal history,

8

noticing that Washington's criminal history prompted several system warnings. J.A. 204. These warnings included alerts that Washington had been involved in corrections, that he was a felon, that he had previous drug offenses, and that police should approach him with caution. J.A. 204.

In addition to completing those tasks, Corthell conducted a vehicle-registration check based on the registration information displayed on the back of the Highlander. J.A. 201, J.A. 209. This information was relevant to whether the car could leave the scene at the end of the traffic stop. J.A. 205. He did not find any issue with the car. J.A. 201. But Corthell noticed that the information he received about the registered owner "matched or closely matched" Washington's female passenger. J.A. 201, J.A. 245. He also checked the owner's driver's-license information and her criminal history. J.A. 211.

Corthell completed tasks related to Washington's driver's license and criminal history, the Highlander's registration, and Pressley's license and criminal history. J.A. 210. The officer paused before completing other necessary steps because he does not often write tickets

9

and he "had to locate the ticket book in a book bag in the rear passenger area" of his patrol car.    J.A. 210.

To complete the traffic citation after these initial steps, Corthell was required to record on the citation the driver's current address, date of birth, employment, and telephone number.    J.A. 206–207.    He was also required to provide the location of the traffic stop, the date and the time of the stop, and the general statute authorizing the charge against the driver.    J.A. 207.    And he needed to identify the statute prohibiting the operation of a car with a suspended license so that he could provide it on Washington's citation.    J.A. 207.    He needed to research the statutory information because his citation book was tailored to alcohol, drug, and tobacco offenses and did not include boxes for traffic offenses.    J.A. 207.    Finally, to complete Washington's citation, Corthell was required to provide the driver with information about the officer and the court.    J.A. 207.

Moments after Corthell had gotten into his patrol car, Asheville Police Officer Chase Hayes arrived at the scene.    J.A. 113, J.A. 254–255.    He initially walked up toward DeStefano at the passenger's side

10

of the Highlander. J.A. 113, J.A. 257. But he soon walked over to the driver's side. J.A. 113, J.A. 257. As Hayes walked by the rear driver's side window, he looked through the partially open window to "see the back seat passenger" and to "make sure nobody else was back there and there were no weapons in plain view." J.A. 258. When he looked into the cracked-open window at 11:25:52 — about thirty seconds after Cortell first entered his patrol car to complete his initial tasks related to the traffic stop — Hayes "could smell the odor of marijuana coming from inside the car." J.A. 258, J.A. 274, J.A. 278–279.

Meanwhile, as Hayes moved to the driver's side of the car, DeStefano returned to his own patrol car. J.A. 113. He did so to check Carson's criminal history after speaking with Pressley and Carson. J.A. 113. DeStefano noticed Corthell in his patrol car at 11:26:35 as DeStefano walked back to his patrol car. J.A. 113.

After smelling the marijuana and looking into the back seat of the Highlander, Hayes walked up to the driver's side window and began talking with Washington. J.A. 259–260. As he was talking with Washington, at approximately 11:27:33, he saw a knife between

11

Washington's legs and a blue digital scale between the driver's and passenger's seats.   J.A. 260–261, J.A. 275.   Although Hayes knew that the officers would search the Highlander, he did not immediately notify the other officers about the marijuana odor or the digital scale because they were not standing near him.   J.A. 261.   Hayes did not want to alert Washington and his passengers about his discoveries before he could alert another officer.   J.A. 261.

Also at 11:27:33, as DeStefano was finishing his records check on Carson, Corthell got out of his car.   J.A. 115–116, J.A. 219.   Before looking for his citation book, Corthell walked over to DeStefano's patrol car and checked in with DeStefano "for officer safety purposes."   J.A. 115–116, J.A. 209, J.A. 211.   Corthell had not been able to see inside the Highlander very well because of its tinted windows and wanted to know if DeStefano had observed any criminal activity or intended to call for a drug dog.   J.A. 211.   During a conversation that lasted less than 30 seconds, Corthell asked DeStefano whether his body-worn camera was activated.   J.A. 134, J.A. 212.   Corthell, whose agency did not use body-worn cameras, had previously been caught on camera using

12

profanity that was later played in court.   J.A. 212.   This experience prompted Corthell to develop a practice of asking if a camera had been activated before interacting with an officer with a body-worn camera. J.A. 212.

DeStefano confirmed that his camera was activated, and Corthell asked whether he "had made any observations that would" require further "traffic stop investigation."   J.A. 134.   He also asked DeStefano if he wanted to "bring a dog up here [while Corthell] wrote the citation." J.A. 116, J.A. 134.   DeStefano asked Corthell if he had seen anything in the car warranting further investigation, and Corthell responded that he had not.   J.A. 116, J.A. 134.

Corthell returned to his patrol car to find his citation book and complete Washington's citation.   J.A. 213, J.A. 248.   As Corthell was walking to his car, Hayes told him that he had seen drug paraphernalia in the Highlander — less than a minute after Hayes had observed it. J.A. 213, J.A. 263.   By 11:28:21, Corthell was back at his patrol car and retrieving his citation book.   J.A. 219–220.   He then worked on completing the citation process.   J.A. 220.   As part of that process, he

13

obtained a court date and asked Washington for employment and other contact information.   J.A. 220.

One second after Corthell was back at his car and retrieving his citation book, at 11:28:22, Hayes told DeStefano that he had probable cause to search the Highlander.   J.A. 116, J.A. 263, J.A. 275.   Hayes explained that he had smelled marijuana and had seen a digital scale, along with a knife, in the driver's area of the Highlander.   J.A. 116, J.A. 263.   The scale had a white residue on it.   J.A. 264, J.A. 338, J.A. 345.   The residue was consistent with narcotics.   J.A. 264.

Escobedo, who had arrived shortly after Hayes had detected marijuana, heard Hayes tell DeStefano that Hayes had smelled marijuana and seen a digital scale.   J.A. 43, J.A. 263, J.A. 276, J.A. 296.   Escobedo walked over to the rear door on the driver's side of the Highlander and shined his flashlight into the car.   J.A. 297–298.   He saw and immediately recognized Carson, who was sitting behind the front passenger's seat.   J.A. 298–299, J.A. 310.

DeStefano asked Washington to get out of the car to facilitate the search, and Escobedo walked over to the passenger's side and asked

14

Carson to get out of the car.   J.A. 43, J.A. 264, J.A. 310–311.   Escobedo immediately smelled marijuana when Carson opened his door.   J.A. 312, J.A. 320.   DeStefano also detected the odor of marijuana as he conducted the search of the Highlander.   J.A. 117.

Carson, whose pants were sagging almost down to his knees, was shaking and appeared nervous when he got out of the Highlander, whispering when Escobedo asked him questions.   J.A. 312–313. Escobedo asked Carson if he had any weapons.   J.A. 43, J.A. 313, J.A. 317.   In response, Carson whispered something unintelligible.   J.A. 43, J.A. 313, J.A. 317.   Escobedo decided to frisk Carson for weapons.   J.A. 43, J.A. 313, J.A. 317.   As Escobedo began to frisk Carson, he tried to pull Carson's pants up because they were "down near his knees."   J.A. 43.   Escobedo was not able to pull Carson's pants all the way up and noticed "something that was weighing the pants down."   J.A. 313. Escobedo asked Carson to spread his feet to facilitate the frisk, but Carson stated that he could not spread his feet.   J.A. 43, J.A. 313–314.

When Escobedo asked Carson why he could not spread his feet, Carson responded that he had a gun.   J.A. 43, J.A. 314.   Escobedo

15

seized a nine-millimeter Glock pistol from Carson's right pants leg. J.A. 43, J.A. 314, J.A. 338, J.A. 344.   The pistol was loaded and had one round in the chamber.   J.A. 43, J.A. 314.   The police also seized a small amount of marijuana and another controlled substance from Carson.   J.A. 43, J.A. 315, J.A. 341, J.A. 344.

Corthell did not participate in the search of the car and finished preparing Washington's citation.   J.A. 213, J.A. 355.   Corthell reviewed the completed citation with Washington and stood with him, Carson, and Pressley to discuss what to do with the Highlander.   J.A. 213–214, J.A. 216.   Pressley had earlier admitted to Hayes that she had been drinking, and after assessing her ability to drive, Hayes determined that it would not be safe for her to operate a car.   J.A. 216, J.A. 277–278.

In an incident report that Corthell completed six weeks after the traffic stop, he stated that before he stopped the Highlander, he learned that Washington's driver's license was suspended and that "covert surveillance" had also placed Carson in the car.   J.A. 40.   Corthell stated that he had learned from those conducting surveillance that

16

Carson "was regularly carrying a firearm" and that Carson was a convicted felon. J.A. 40. Corthell reported that approximately a minute after receiving these reports, he saw the Highlander cross over Ashland Avenue onto Phifer Street. J.A. 40.

Corthell stated further in his incident report that after obtaining Washington's identification card, he returned to his patrol car and "began preparing a written citation," charging Washington with driving while his license was suspended in violation of North Carolina General Statutes § 20-28. J.A. 40. Corthell reported that as he was doing so, he "overheard Asheville Police Officers indicate they observed drug paraphernalia in the vehicle." J.A. 40, J.A. 241. "A short time later," Corthell stated, the police officers "indicated a firearm was seized from Carson." J.A. 40–41. Corthell stated in his report that after he issued Washington the citation, he moved the Highlander to a parking area at the intersection at Washington's and his passenger's request because she had "consumed alcohol and was not able to drive." J.A. 41.

17

**B.     Carson pleads guilty to a firearm offense after the district court denies Carson's motion to suppress, and the district court sentences him to 24 months in prison.**

A federal grand jury indicted Carson and charged him with possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1).   J.A. 11–12.   Carson moved to suppress the firearm, arguing that Corthell exceeded the time needed to process the traffic stop and that he was frisked without reasonable suspicion that he was armed and dangerous. J.A. 15–16.   Carson argued that both actions violated his Fourth Amendment right to be free from unreasonable searches and seizures. J.A. 15–16.

A magistrate judge conducted an evidentiary hearing on Carson's motion to suppress and heard from five of the officers involved in the stop of the Highlander.   J.A. 74–336.   The magistrate judge also watched video recordings from three of the officer's body-worn cameras depicting the traffic stop.   J.A. 119–123, J.A. 217–220, J.A. 269, J.A. 273–276, J.A. 315–318.

Corthell testified during the hearing that although he ordinarily would have run a registration check on the Highlander before

18

approaching it, he approached the Highlander on May 20 before running that check because "the whole situation" developed quickly. J.A. 197. He also did not have the computer application that would have enabled him to run that check — CJLEADS — "up and running" by the time he pulled Washington over. J.A. 197. Corthell explained that because he was "approaching an area that [he] knew was a high-crime area to conduct the vehicle stop," he did not get a chance to run it before he approached and "got the vehicle stopped." J.A. 197. When asked about the slightly open driver's side window and whether he smelled anything unusual, Corthell testified that he did not smell anything. J.A. 198. He explained that he had lost his sense of smell at the time of the stop because of a COVID-19 infection. J.A. 198.

Corthell testified that when there are passengers during a traffic stop, he often requests and checks their information as well. J.A. 206. Particularly when the driver's license is suspended or revoked, he tries to obtain the passengers' information to avoid the cost of towing and to enable a passenger to drive the car. J.A. 206.

19

Corthell acknowledged during the hearing that some of the statements he had made in the incident report he wrote approximately six weeks after the stop were not correct. J.A. 242. He had incorrectly written that he heard that Hayes had seen drug paraphernalia while he was preparing Washington's citation. J.A. 241–243. Corthell had actually heard this information from Hayes when Corthell was returning to his patrol car to retrieve his citation book. J.A. 241–243. Additionally, Corthell had incorrectly reported moving Washington's car after his discussion with Washington and Pressley. J.A. 246–247. Corthell acknowledged that Washington had moved the car himself. J.A. 246–247.

Corthell explained that his ordinary policy was not to allow a person who had been issued a citation to move a car. J.A. 247. But he believed another officer had "kind of orchestrated that." J.A. 247. Corthell testified that after the operation, the communication between his agency and the police department had "dissolved a little bit" and Corthell wrote "a real quick report" after being told that the police needed it for discovery. J.A. 244. Corthell acknowledged that he

20

exercised "bad judgment" in writing his report "without thoroughly researching it." J.A. 244.

During the hearing, Hayes watched video footage from his body-worn camera, recorded during the traffic stop. J.A. 268–269, J.A. 273. Asked to identify when he detected the odor of marijuana, Hayes identified that time as 11:25:52, when Hayes was standing at the Highlander's rear driver's side window and his nose was "equal with the opening in the back window." J.A. 274, J.A. 278–279. Hayes testified that he saw the digital scale at around 23:27:39 and told Corthell what he had observed at approximately 23:28:13. J.A. 275.

The magistrate judge recommended that the district court deny Carson's motion to suppress. J.A. 431–454. The magistrate judge found that Corthell did not unconstitutionally extend the traffic stop and that Escobedo's frisk of Carson comported with the Fourth Amendment. J.A. 448–449, J.A. 453.

The magistrate judge credited Corthell's testimony that he pursued the purposes of the traffic stop when he returned to his patrol car after speaking with Washington. J.A. 447. He found that the

21

police developed probable cause to search the Highlander when Hayes detected an odor of marijuana, approximately a minute and a half before Corthell paused the citation process to speak with DeStefano. J.A. 448. And the magistrate judge found that Escobedo had reasonable suspicion to believe that Carson was armed and dangerous, sufficient to justify the weapons frisk. J.A. 453.

Carson objected to the magistrate judge's memorandum and recommendation. J.A. 455. Carson argued that the magistrate judge's findings of fact were against the weight of the evidence, that he legally erred in finding that the traffic stop was not unconstitutionally extended, and that he legally erred in finding that reasonable suspicion supported Escobedo's frisk of Carson. J.A. 465–486.

The district court overruled Carson's objections and denied his motion to suppress. J.A. 490–494. The district court found that the evidence supported the magistrate judge's finding that the police officers developed probable cause when one officer detected the odor of marijuana in the Highlander while Corthell was completing tasks required to issue a citation to Washington. J.A. 491–492. The district

22

court also held that Escobedo's frisk of Carson comported with the Fourth Amendment because the officers had reasonable suspicion that illegal drugs were in the Highlander before Carson was frisked. J.A. 493 (quoting *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998)).

A month after the district court denied his motion to suppress, Carson entered a conditional guilty plea, authorizing him to appeal the denial of his motion. J.A. 497–519, J.A. 568–574. The district court sentenced Carson to a term of 24 months in prison, a downward variance from the 30–37 month range the United States Sentencing Guidelines advised. J.A. 552, J.A. 561, J.A. 591, J.A. 596–598.

## SUMMARY OF THE ARGUMENT

I.    The district court properly found that the Fourth Amendment authorized Carson's detention. The Fourth Amendment undisputedly authorized officers to stop Washington's car. And within 30 seconds of the time Corthell walked back to his patrol car after speaking with Washington to complete the steps necessary to issue a citation, Hayes detected the odor of marijuana, supplying probable cause to search the Highlander and detain Carson until that search was

23

complete. Carson has not identified any acts undertaken by Corthell that were unrelated to the mission of the traffic stop. But even if he had, none of those acts extended Carson's detention, and Carson has not shown that he was unreasonably seized in violation of the Fourth Amendment.

II. The district court also properly found that Carson's frisk was supported by reasonable suspicion that he was armed and dangerous. The evidence that marijuana was likely in the Highlander, based on Hayes's and Escobedo's detection of the odor of marijuana, alone supports the district's finding of reasonable suspicion to support Carson's frisk. If that odor were not enough, the additional information known to Escobedo would well support the frisk. These facts included Carson's history of committing violent crimes, his recent association with individuals suspected of drug trafficking and firearm possession, his nervousness and failure clearly to deny that he had a firearm in his possession, and Carson's seizure in an area that the police officers uniformly described as high-crime. Considered in their

24

totality, these circumstances furnished reasonable suspicion to support

Escobedo's frisk of Carson.

## ARGUMENT

**I.    The district court properly found that the Fourth Amendment authorized Carson's detention.**

### A.    Standard of Review

When this Court reviews a decision on a motion to suppress, it

ordinarily reviews questions of law, including determinations of

reasonable suspicion, de novo.   *Ornelas v. United States*, 517 U.S. 690,

699 (1996).   "Absent clear error," this Court "will not disturb factual

findings made by a district court after an evidentiary hearing on

suppression issues."   *United States v. Palmer*, 820 F.3d 640, 648 (4th

Cir. 2016).   This Court "particularly defer[s] to a district court's

credibility determinations," because "it is the role of the district court to

observe witnesses and weigh their credibility during a pre-trial motion

to suppress."   *United States v. Purks*, 139 F.4th 388, 396 (4th Cir. 2025)

(quotation omitted).   This Court also views the evidence in the light

most favorable to the United States when the district court has denied a

motion to suppress.   *Id.*   And this Court's "inquiry is not limited to the

25

district court's reasoning"; it is "entitled to reject a remand request and affirm on 'any ground supported by the record.'" *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (quoting *United States v. Patterson*, 278 F.3d 315, 317 (4th Cir. 2002)).

**B.     Discussion**

The district court did not err when it found that police acted consistently with the Fourth Amendment because they developed probable cause to search the Highlander and extend Carson's detention before Corthell completed the mission of the traffic stop.   The magistrate judge heard evidence that by the time Corthell paused his incomplete citation-drafting tasks to ask DeStefano about a potential dog sniff, Hayes had already detected an odor of marijuana and had seen Washington's digital scale in plain view.   Carson was lawfully detained for only a minute before the police developed probable cause, and the officers did not take any steps that unlawfully extended the detention.

The Fourth Amendment authorizes police to seize the driver and any passengers during a lawful traffic stop.   *See Arizona v. Johnson,*

26

555 U.S. 323, 327 (2009). Carson does not dispute that the traffic stop itself, or the officers' seizure of the car and its occupants was lawful at its outset.

The Fourth Amendment authorizes "a police investigation" of the violation that justified the stop. *Rodriguez v. United States*, 575 U.S. 348, 345 (2015). The "tolerable duration" is the time necessary to "the seizure's 'mission' — to address the traffic violation that warranted the stop." *Id.* That mission includes the tasks necessary to it, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration," among other tasks required to prepare a citation. *Id.*; *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). And because "traffic stops are 'especially fraught with danger to police officers,'" *Johnson*, 555 U.S. at 330 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)), the mission also includes any tasks reasonably related to officer safety, *Rodriguez*, 575 U.S. at 354, 356.

The Fourth Amendment also permits an officer "to extend a traffic stop" to investigate additional criminal activity upon "reasonable

27

suspicion" of that "criminal activity." *United States v. Smart*, 91 F.4th 214, 223 (4th Cir. 2024). The seizure of a passenger detained because of a lawful traffic stop, however, violates the Fourth Amendment if it is prolonged beyond the time reasonably required to complete the mission of the traffic stop without reasonable suspicion to further detain the passenger. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The district court properly held that Corthell did not unconstitutionally extend Carson's detention. Under the automobile exception to the Fourth Amendment's warrant requirement, police may detain a car's occupants to search the car if there is probable cause to believe there is contraband or evidence of crime inside of the car. *United States v. Turner*, 122 F.4th 511, 517 (4th Cir. 2024); United States v. *Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021). And "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 58 (2018) (quoting *Kaley v. United States,* 571 U.S. 320, 338 (2014)). This Court has described it as a "flexible standard" that requires "less of a showing than does the formal preponderance-of-the-evidence standard." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012).

28

The Supreme Court has described the standard as requiring "only a probability or substantial chance of criminal activity." *Wesby*, 583 U.S. at 57.

This Court has "repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004); *see also Wesby*, 583 U.S. at 58 n.5 (explaining that "a reasonable officer could infer, based on the smell, that marijuana had been used in the house"). Once a police officer detects the odor of marijuana in a car, therefore, the police have probable cause to search the car for contraband. *Palmer*, 820 F.3d at 650. Carson conceded as much in the district court, telling the magistrate judge that if the court credited Hayes's testimony that he detected the odor of marijuana when he was beside the rear driver's side door at 11:25:52, "probable cause to search the vehicle accrued at that time." J.A. 401–403.[1]

---

[1] In challenging the legality of his detention, Carson does not argue differently in his opening brief. *See Br. of Appellant* at 32–40. He asserts in a footnote in the section of his brief challenging his frisk that marijuana odor "may not even supply a reasonable belief that criminal activity is afoot." *Id.* at 46 n.8. His concession in the district court,

29

Ample evidence supports the court's finding that the police developed probable cause before Corthell completed or reasonably could have completed the tasks required to issue Washington's traffic citation. Hayes testified that he first detected the odor of marijuana at 11:25:52 p.m. He recalled that he smelled the marijuana when he looked into the driver's-side rear window. And body-camera footage showed his nose at the level of the window opening at that time. The magistrate judge reviewed additional body-camera footage that showed that Corthell had walked away from the car after talking with Washington and obtaining his identification fewer than 30 seconds earlier, at 11:25:23. And Corthell remained in his patrol car, running checks on Washington's identification and criminal history, on the Highlander's registration, and on the registered owner's driver's license and criminal

---

however, waived any challenge to the sufficiency of marijuana odor to support probable cause to search a car by conceding or reasonable suspicion to believe criminal activity is afoot. *See United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014). If his concession in the district court were not enough, Carson waived the issue by taking, at most, a "passing shot" at the issue and "failing to develop" an argument that marijuana odor is insufficient to support probable cause to search a car (or reasonable suspicion that criminal activity is afoot). *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

30

history, until 11:27:33. At that time — after Hayes had smelled the marijuana — Corthell got out of his car and spoke briefly to DeStefano about the possibility of a dog sniff. Hayes's detection of marijuana before Corthell completed even his initial tasks related to the traffic stop fully supports the district court's finding that Carson's detention was not extended — without further reasonable suspicion or probable cause — beyond the time required for the completion of the traffic stop's mission.

This Court should reject Carson's suggestion that Corthell unconstitutionally extended the traffic stop by researching whether the Highlander was stolen or had recently been used in a violent crime. The Fourth Amendment permitted those steps for at least two reasons.

First, Corthell was in his car when he conducted that and several other inquiries in just over two minutes, between the time he returned to his patrol car after talking with Washington at 11:25:23 and getting out of his patrol car at 11:27:33 to speak with DeStefano. And Corthell testified that in addition to all of the tasks he completed during that time, he still needed to retrieve his citation book, research the statutory

31

provision that Washington violated, obtain Washington's employment and contact information, obtain a court date, and record all of the information on the citation form.   Even if the steps about which Carson complains were "unrelated" to the mission of addressing the traffic violation and attending to related safety concerns, they did "not measurably extend the duration of the stop."   *Rodriguez*, 575 U.S. 348, 354–55.

Second, the steps about which Carson complains addressed permissible "safety concerns."   *Rodriguez*, 575 U.S. at 354.   The officers who testified during the suppression hearing uniformly described the area near the traffic stop as an area of high crime and an area where they regularly experienced verbal and even physical harassment while conducting police activities.   Corthell's investigation into Washington's criminal history uncovered numerous warnings related to his dangerousness, including the alert to approach him with caution.   And Corthell explained that whether the Highlander had been involved in a crime of violence was relevant to officer safety.   The district court could reasonably conclude that this investigation was

32

related to the safety mission of the traffic stop and that it did not extend the stop in any event because the police developed probable cause to search the Highlander fewer than 30 seconds after Corthell returned to his patrol car.

Corthell's investigation into the registered owner's criminal history also did not unconstitutionally extend the traffic stop. For the same reasons Corthell's research into the Highlander could not have extended the traffic stop when considered in the light of how quickly Hayes developed probable cause after Corthell returned to his patrol car and how many traffic-stop tasks remained even after Corthell completed the initial checks, his criminal-history check of the registered owner could not have extended the reasonable amount of time required for the traffic stop. Additionally, because Corthell concluded that the information he received about the registered owner "matched or closely matched" Washington's female passenger, Corthell's running the owner's criminal history was reasonably related to the safety mission of the stop. J.A. 201, J.A. 245.

33

Carson's argument that Corthell unconstitutionally extended his detention by pausing his citation-related activities to speak briefly with DeStefano fares no better. Corthell approached DeStefano more than a minute and a half after Hayes detected the odor of marijuana and had supporting probable cause to search the Highlander for contraband.

Finally, this Court should reject Carson's suggestion that his detention was unconstitutionally extended because Corthell was not aware that Hayes had detected marijuana until after his conversation with DeStefano. First, Corthell testified that in addition to the traffic-stop-related tasks he had completed when he paused to speak with DeStefano, he had numerous additional tasks to complete, including retrieving his citation book, finding the legal authority supporting the citation, gathering additional information about Washington's employment and contact information, and obtaining a court date, in addition to recording that information on the citation. Those tasks would have required well more than the 30 seconds Corthell took to speak with DeStefano. And Hayes reported his findings to Corthell as Corthell was walking back to his patrol car to retrieve his citation book.

34

That conversation, therefore, could not have unconstitutionally extended the time reasonably required for the traffic stop before the police developed probable cause.

More importantly, the operative inquiry is whether Carson's detention was prolonged without "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. As soon as one of the detaining officers developed probable cause to search the Highlander and extend Carson's detention, tasks unrelated to the mission of the traffic stop did not extend Carson's detention. *See Palmer*, 820 F.3d at 650 (explaining that unless the defendant could "demonstrate some constitutional violation between the time the stop began and the point that [the police officer] smelled marijuana, the evidence cannot be suppressed"). Instead, the existence of probable cause to search the Highlander extended the basis for Carson's lawful detention. And before the police searched the Highlander, Escobedo found Carson's unlawfully possessed firearm.

Carson's suggestion that the district court improperly relied on the collective-knowledge doctrine in denying his motion to suppress

35

misses its mark.   Any one of the officers present could lawfully detain Carson once one of the officers developed probable cause supporting the search of the Highlander and Carson's further detention.   *See United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) (explaining that the collective-knowledge doctrine holds that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself"). Carson asserts that "Hayes needed to communicate an alert or instruction to Corthell for him to rely on Hayes' knowledge to justify his detour."   *Br. of Appellant* at 40.   But the constitutional violation is not a police officer's pursuit of information unrelated to the mission of the traffic stop.   It is instead the extension of an individual's seizure *because* the police officer pursued information or conducted other activities unrelated to the stop's mission.

Carson's seizure was not unconstitutionally extended because Corthell had a brief conversation with DeStefano about the possibility of a dog sniff, whether or not that conversation related to original mission of the traffic stop.   Carson's seizure was lawfully extended

because Hayes smelled marijuana, supporting probable cause to search the Highlander and Carson's continued seizure until that search was completed, no matter what actions Corthell took or did not take from the time the police developed probable cause to support the search until the search was completed.

## II.    Reasonable suspicion that Carson could be armed and dangerous justified Escobedo's frisk of Carson.

### A.    Standard of Review

This Court reviews de novo whether the police had reasonable suspicion sufficient to frisk the defendant. *United States v. Quarles*, 330 F.3d 650, 653 (4th Cir. 2003).

### B.    Discussion

The district court properly found that Escobedo frisked Carson consistently with the Fourth Amendment because he had reasonable suspicion that Carson might be armed and dangerous.    The Fourth Amendment authorizes a police officer to frisk a detainee for weapons if "two requirements" are met.    *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc).    First, the officer must "have the right to stop" him, including for "a traditional *Terry* stop."    *Id.* at 698, 700.

37

The officer has that right if he has reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968). The Fourth Amendment gave police the right to stop Carson as an occupant of the car for a traffic violation, and Corthell does not suggest otherwise.

Second, during the encounter, the officer must "reasonably suspect that the person is armed and therefore dangerous." *Id.* at 700. When assessing whether law-enforcement officers had reasonable suspicion to detain and frisk a suspect, a district court must consider the totality of the circumstances. *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Id.* The reasonable-suspicion standard is less demanding than probable cause and "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "[S]pecific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity" suffice to establish reasonable suspicion. *Branch*, 537 F.3d at 336 (cleaned up). This Court has held that when, in

38

connection with a lawful traffic stop, "the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others." *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998); *see also United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010).

The Fourth Amendment authorized Escobedo to protect everyone's safety by frisking Carson during his lawful detention at 11:00 p.m., in a high-crime area, with information that illegal drugs were likely in his car. Escobedo had reasonable suspicion that Carson was armed and dangerous for several reasons.

First, under this Court's decision in *Sakyi*, Escobedo could frisk Carson consistently with the Fourth Amendment because he reasonably suspected that an illegal drug was in the car. *See Sakyi*, 160 F.3d at 169. "[G]uns often accompany drugs." *Id.* And nothing about the circumstances ameliorated the well-known "risk of danger to an officer

39

from any occupant of a vehicle he has stopped" when "the presence of drugs is reasonably suspected." *Id.* at 169.

Second, even if *Sakyi* did not decisively establish the constitutionality of Carson's frisk, the totality of the circumstances would. The circumstances gave the officer well more than reasonable suspicion to believe that Carson was armed and dangerous: (1) Escobedo immediately recognized Carson as one of a group of young men suspected of drug trafficking and carrying firearms in and around the Aston Park public-housing development; (2) Escobedo was aware that Carson had a history of violent offenses, including kidnapping, armed robbery, and assault offenses and that Carson's criminal-history report identified him as a "violent offender," J.A. 353; (3) Escobedo testified that when he opened the rear passenger's-side door to ask Carson to get out of the car, he immediately smelled marijuana; (4) Carson appeared nervous, shaking and whispering in response to questions asked by Escobedo; (5) when Escobedo asked Carson if he had a weapon, Carson did not audibly deny it, instead whispering something Escobedo could not understand; and (6) Escobedo was aware

40

that the area of the traffic stop and the Aston Park housing development where Escobedo had seen Carson were both high-crime areas, where police regularly experienced hostility and threatening behavior and responded to violent and drug-trafficking crimes.

These circumstances include facts specific to Carson, including his recent activity, his criminal history, and his conduct during the traffic stop. They also include significant evidence about the criminal activity common in the area of the traffic stop and in the areas Carson had recently frequented. Considered in their totality, these facts, "taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch" that Carson was armed and dangerous. *Branch*, 537 F.3d at 336 (cleaned up).

This Court should reject Carson's attempt to obfuscate the import of the aggregate of these circumstances by asking this court to apply the "divide-and-conquer analysis" that *Terry* precludes. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Frazer*, 98 F.4th 102, 110 (4th Cir. 2024). But even if this Court considers Carson's

41

challenge to the individual circumstances, those challenges do not undermine the district court's reasonable-suspicion determination.

First, the magistrate judge did not discredit Escobedo's testimony that Carson appeared nervous. *See Br. of Appellant* at 43. The magistrate judge stated in a footnote that Carson's nervousness was "not immediately evident from Officer Escobedo's body camera footage." J.A. 453 n.13. But the magistrate judge did not find that Escobedo's testimony that he saw Carson's nervousness and shaking was not credible. He simply chose not to rely on that testimony.

Similarly, the magistrate judge did not decline to find that the stop occurred in a high-crime area, as Carson also suggests. *See Br. of Appellant* at 43. The magistrate judge's statement that "all officers testified during the hearing that the stop occurred in an area about which they had heightened safety concerns," J.A. 452–453, in explaining his finding of reasonable suspicion to justify Carson's frisk is not a rejection of the evidence that the stop took place in a high-crime area. It is a statement that relies upon that testimony in finding that the "heightened safety concerns" that the officers had during the stop

42

because of the area in which the stop occurred contributed to the reasonable suspicion that Carson was armed and dangerous. And that reliance was not clearly erroneous because every officer who testified at the hearing testified that the stop occurred within walking distance of two public-housing developments known for all kinds of criminal activity, including homicides and shootings. The magistrate judge reasonably declined to reject the officers' uniform testimony based on Carson's submission of three months of crime data related to those public-housing developments. *See* J.A. 481, J.A. 487–488. That data indeed reflected the commission of numerous crimes, including drug-trafficking and assault offenses, within those three months. *See* J.A. 481, J.A. 487–488.

Contrary to Carson's suggestion, the district court was not compelled to ignore his criminal history or the surveillance that revealed that Carson, who was not a resident of Aston Park, had regularly been seen in an area of the development where a group of young men appeared to be engaged in drug trafficking and where there were reports of gun possession among them. Even if each of those facts

43

in isolation would not suffice to establish reasonable suspicion that a lawfully-detained individual was armed and dangerous, they would be enough when in connection with the many other circumstances indicating danger known to Escobedo. And the presence of five other officers at the scene of the traffic stop did not limit Escobedo's authority to protect everyone's safety by frisking Carson. This Court has "never recognized that taking one step to preserve officer safety during a *Terry* stop precludes others." *United States v. Perry*, 92 F.4th 500, 512 (4th Cir. 2024).

Finally, this Court should decline Carson's invitation to overrule *Sakyi*. As this Court explained in *United States v. McCoy* when asked to overrule *Sakyi* for the same reasons (and by a colleague of Carson's attorney), the rule that "one panel cannot overrule a decision issued by another panel" governs this invitation. 773 F. App'x 164, 166 (4th Cir. 2019) (unpublished decision) (quoting *United States v. Williams*, 808 F.3d 253, 261 (4th Cir. 2015)). Additionally, Carson's argument that *Sakyi* "rests on authority" that has "subsequently prove[d] untenable," excusing this Court from deferring to the prior-panel rule, lacks merit.

44

Recreational and medical marijuana use remains illegal under both federal and North Carolina laws. *See* N.C. Gen. Stat. §§ 90-94, 90-95(a), (b)(2).

Additionally, even if *Sakyi* did not independently furnish reasonable suspicion to support Escobedo's frisk of Carson, the district court's reasonable-suspicion determination would still be correct, considering the totality of the circumstances. It remains illegal in North Carolina to use marijuana. Its presence in the Highlander could reasonably contribute to a finding of reasonable suspicion that Carson was armed and dangerous. And when that fact is considered along with the evidence of Carson's criminal history, his recent presence among others who were suspected of drug-trafficking and firearm possession, his nervousness and failure to audibly deny that he had a weapon when asked, and the high-crime character of the neighborhood where Carson was seized, the district court properly found that Escobedo had reasonable suspicion to believe that Carson was armed and dangerous when he frisked Carson.

45

## CONCLUSION

The district court properly denied Carson's motion to suppress because the police did not unconstitutionally extend Carson's detention and reasonable suspicion supported Escobedo's frisk of Carson.   The United States, therefore, respectfully requests that this Court affirm the judgment of the district court.

## REQUEST FOR DECISION ON THE BRIEFS WITHOUT ORAL ARGUMENT

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

Respectfully submitted, this 19th day of November, 2025.

> RUSS FERGUSON
> UNITED STATES ATTORNEY
> s/ Amy E. Ray
> Amy E. Ray
> NC Bar Number # 22762
> Assistant United States Attorney
> U.S. Courthouse, Room 233
> 100 Otis Street
> Asheville, North Carolina 28801
> Telephone: (828) 271-4661
> Fax: (828) 271-4670
> E-mail: Amy.Ray@usdoj.gov

46

## **CERTIFICATE OF COMPLIANCE**

1.    This brief has been prepared using Microsoft Word 2010, Century Schoolbook, 14 point typeface.

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains __8,414__ words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/ Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorney of record, Melissa S. Baldwin, through electronic case filing.

This 19th day of November, 2025.

s/ Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC